THE STATE v. EDDINGS, *Appellant*.

1. **The Evidence** of defendant's guilt is sufficient to warrant the verdict in this case.

2. **Criminal Law**: TESTIMONY OF DEFENDANT AS EVIDENCE AGAINST HIMSELF. If the defendant in a criminal case voluntarily offers himself as a witness in his own behalf, his answers to questions propounded to him upon cross-examination may be used against him upon a second trial of the same case. Such answers cannot be treated as involuntary admissions.

*Appeal from Randolph Circuit Court.*—HON. G. H. BURCK-HARTT, Judge.

AFFIRMED.

*Winslow* and *Reed & Hall* for appellant.

*J. L. Smith*, Attorney-General, for the State.

HENRY, J.—The defendant was indicted at the October term of the Randolph circuit court, 1879, charged in the first count with having burglariously broken into the dwelling-house of one M. C. McMillan, with intent to commit a rape upon the person of Ida McMillan, then in said dwelling-house. The second count was the same, except in charging the intent to have been to commit a rape upon Mary McMillan. The defendant was tried and convicted; and from the judgment he has prosecuted his appeal.

The evidence established the following facts: That Mr. McMillan slept in one room, and his little boy and two 1. THE EVIDENCE. little daughters in an adjoining room on the first floor. From this room there was a door opening into a front yard. There was a lock, but no key, to the door,

35—71

and it was fastened on the inside with a bolt on top of the lock, and the door, when bolted, could not be opened from the outside by turning the knob. By the side of this door was a window, about a foot from it, and when up, one on the outside could put his arm through the window and reach the lock and unbolt the door. A stairway runs up from the room in which the boy and little girls slept into an upper room. The stairway is on the opposite side of the room from the door. There is a door to the stairway, which latches, and is opened with some difficulty.

On the night in question, July 21st, 1879, before retiring, Mr. McMillan fastened the gate in front of the house with a rope. It being a warm night, the little boy asked his father to pull his bed, which was an ordinary lounge, out from the wall, and his father moved it out, so that the head of the lounge was near the window, which was raised as high as it could be, about six or eight inches. The lounge then stood in front of the door, and so near that the door would not swing clear open, and one entering would have to go around the lounge or move it to get into the room. On the night in question, this door was bolted and the door of the stairway was latched. Misses Ida and Mary McMillan were sleeping in the upper room, and early the next morning the defendant was found lying on the floor at the head of the stairs in the girls' room. His head was toward the girls' bed, and by the side of it, and his body lay in front of the landing of the stairs, so that no one could get into or out of the room without passing over him. He had on no clothing, except his pants and shirt. There were but two small windows to the upper room, of about four panes of glass each, and eleven feet from the ground. In the morning, the yard gate and the door leading into the front yard above mentioned were both open, and the door of the stairway was closed. There was no access to the upper room but through the stair door or the windows.

Miss Mary McMillan testified that she was aroused

from sleep that night by something touching her side; thought it felt like a hand on her side; brushed it away; was frightened; spoke to her sister, Ida, in an ordinary tone of voice, and asked her if she was too warm; she muttered an answer. Witness didn't think Ida was awake; thought then it was her sister's hand, or a cat that staid in the room; laid awake awhile, and heard a breathing; thought it was the cat; after a while fell asleep again; heard the clock strike one; was disturbed no more that night, nor was her sister; did not wake until morning light, and then saw defendant on the floor, and called her mother. Windows in the upper room had but one sash each, and were open that night.

The evidence for defendant tended to prove, that on the afternoon and evening of the 21st day of July he was drunk. He also proved a good moral character, except occasional intemperance. The counsel for defendant contend that the evidence did not warrant the verdict of the jury, and their theory is that the defendant, in a state of intoxication, not knowing where he was going, went into this house with no evil intent, and especially with no purpose to commit the rape charged.

It would have required a reasonably sober man to open the door by thrusting his arm through the raised window, and removing the bolt, and get around the lounge in front of it, and then open the stairway door and close it after him, without arousing the sleepers in the house. If unacquainted with the manner in which the door was fastened, and ignorant that the lounge was standing across it, and the location of the stairway, and the difficulty of opening the door which led to the upper room, the feat performed by the defendant would have been difficult to a duly sober man in the possession of all his faculties. He had, according to the testimony, wandered about the town of Huntsville that afternoon and night, and drunk or sober, he used the precaution to go to his own house and take off all of his clothes except his shirt and pants, before he went to

McMillan's house.    He was incumbered as little as possible
with apparel, and there was method in this for it facilitated
his escape if retreat became necessary, and the accomplish-
ment of his hellish purpose if the opportunities sought
were found.    The evidence of Miss Mary McMillan, leaves
but little doubt that it was the hand of the defendant upon
her side that aroused her; and her talk with her sister may
have been the first intimation that the accused had that
there were two ladies, instead of one, in that room, and
the inference is not unreasonable that, on making this dis-
covery, he sank down by the side of the bed to await an
opportunity to escape, that discovery having deterred him
from making the attempt upon her person.

The theory that the defendant was so drunk when he
went into the house that he did not know what he was
doing, cannot for a moment stand before the undisputed
facts.    And this court cannot say that there was no evi-
dence, or but a scintilla of evidence to support the charge
in the indictment.    It was an extremely rash undertaking,
but the temerity of drunken men is proverbial, and they
will do what sober men would shudder at the thought of
attempting.

On a former trial, the defendant voluntarily offered
himself as a witness, and at the trial now under review
2. CRIMINAL LAW: Mr. Phillips, a juror on the former occasion,
testimony of de-
fendant as evi- was called by the State to testify what the
dence against
himself.       testimony of defendant then was.    To this
defendant objected, and the court overruled the objection,
and witness testified that defendant, on a former trial, when
sworn, stated, as a witness, that he was drinking all
Sunday evening; went to the    Methodist church that
night; went out behind the church, laid down and went
to sleep; when church was over, some one woke me up;
as I came back to town, I fell in company with a girl, took
her to an ice cream saloon, treated her and took her home;
then I went down by the butcher's corner, lay down and
went to sleep; was waked up by the barking of a dog;

the butcher's dog, a white dog; then I got up and went home; did not recollect anything else until next morning, when Mr. Belsher woke me up in Mr. McMillan's room.

It is contended that his statement, so made, can only be received in evidence as a confession, and, to be admissible as a confession, it must have been voluntary. He had his option to testify or not, and when he voluntarily became a witness, he volunteered to answer all proper questions propounded on cross-examination. He became as any other witness. He took the risk of answering any questions on cross-examination, for the advantage of testifying in chief in his own behalf. It cannot with any propriety be said that his answers to questions asked him on cross-examination were involuntary. He chose to put himself in a position which invited them. He offered himself as a witness to tell the whole truth, not only what made for him, but what would be against him; not only to answer questions propounded by his counsel, but those propounded by the State. He was not to be treated as a witness as to his testimony in chief, and as a party as to his testimony on cross-examination. In the case of *The People v. Arnold*, decided at the April term, 1880, of the supreme court of Michigan, reported in the N. W. Reporter, this question was involved, and determined in favor of the State. The opinion was delivered by Judge Cooley, and the reasons assigned for the conclusion reached are unanswerable.

His status was that of a witness. He was not compelled to assume that character, and the statute expressly provides that his refusal or neglect to offer himself as a witness shall not raise any presumption of guilt, nor shall that circumstance be referred to by any attorney prosecuting in the cause, nor shall the same be considered by the court or the jury before whom the trial takes place. In view of this humane and liberal provision, with what propriety can it be said that any statement made by him as a witness on the stand was not voluntary? By volunteering,

he became, as to his testimony, but a witness. To that extent, he lost his character as the party accused.

The cases referred to by counsel to establish their position on the subject do not sustain them. Mr. Greenleaf, in section 225 of his work on evidence, states the doctrine upon which defendant's counsel rely. "The manner of examination is, therefore, particularly regarded; and, if it appears that the prisoner had not been left wholly free, and did not consider himself to be so, in what he was called upon to say, or did not feel himself at liberty wholly to decline any explanation or declaration whatever, the examination is not held to have been voluntary. In such cases, not only is the written evidence to be rejected, but oral evidence will not be received, of what the prisoner said on that occasion. The prisoner, therefore, must not be sworn. But where, being mistaken for a witness, he was sworn, and afterward, the mistake being discovered; the deposition was destroyed, and the prisoner, after having been cautioned by the magistrate, subsequently made a statement, this latter statement was held admissible. It may, at first view, appear unreasonable to refuse evidence of confession merely because it was made under oath, thus having in favor of its truth one of the highest sanctions known in the law. But it is to be observed that none but voluntary confessions are admissible; and that, if to the perplexities and embarrassments of the prisoner's situation are added the danger of perjury and the dread of additional penalties, the confession can scarcely be regarded as voluntary; but, on the contrary, it seems to be made under the very influences which the law is particularly solicitous to avoid. But, where the prisoner, having been examined as a witness in a prosecution against another person, answered questions to which he might have demurred, as tending to criminate himself, and which, therefore, he was not bound to answer, his answers are deemed voluntary, and as such, may be subsequently used against himself for all purposes, though, where his answers are

compulsory and under peril of punishment for contempt, they are not received."

It will be observed that the reason for excluding a statement sworn to by the prisoner, under the circumstances mentioned by Prof. Greenleaf, is wholly inapplicable to the question we are considering. He offers himself here as a witness, for the very purpose of having what he may say considered by the jury in determining whether he is guilty or not. He is permitted to do so by the statute, and it might with as much plausibility be contended that the jury before whom he testifies could not consider his testimony, because involuntary, as that a subsequent jury could not hear and consider evidence of what he testified to on a former trial.

We think that the prisoner had a fair trial, under extremely liberal instructions from the court, and that no error occurred in the trial which would justify a reversal of the judgment. It is, therefore, affirmed, all concurring.