THE STATE v. FRANK PINKARD, Appellant.—300 S. W. 748.

Division Two, December 12, 1927.

*Sam Withers* and *Jno. D. Taylor* for appellant.

*North T. Gentry,* Attorney-General, and *J. D. Purteet,* Special Assistant Attorney-General, for respondent; *John T. Morris,* of counsel.

HENWOOD, C.—Appellant was tried and convicted in the Circuit Court of Carroll County for assault with intent to commit rape. The jury assessed his punishment at imprisonment in the penitentiary for four years. He was sentenced accordingly and appealed.

The prosecutrix or victim of the alleged assault was appellant's own daughter, Christine Pinkard. At the time in question she lacked four months of being seventeen years old. The family consisted of appellant and his wife and five girls and one boy, including Christine. The ages of the other children ranged from a baby girl less than a year old to the girl next to Christine, who was then thirteen years of age. They lived on a farm about four miles southeast of the town of Hale in Carroll County. The house in which they lived had six rooms, four downstairs and two upstairs. Appellant and his wife and the baby slept downstairs and Christine and the other children slept upstairs. Mrs. Pinkard had been in delicate health for a long time and Christine was "doing the house work and cooking." The mother died within a few months after the occurrence in question and before the trial of this case. On the night of June 30, 1926, the date alleged in the information, Christine and Catherine slept together in the south room upstairs. They had on no clothing except their nightgowns. As to what happened that night, Christine testified as follows:

"Q. Now what happened there? A. Well, I was awakened by hands on me.

"Q. Where were the hands? A. On my private parts.

"Q. That awakened you, did it? A. Yes, sir.

"Q. When you awakened who, if anyone, did you see there? A. My father.

"Q. The defendant here, Frank Pinkard? A. Yes, sir.

"Q. What was he doing? Just tell how he was situated. A. Well, he was up over me; had his knees on the bed.

"Q. Where was his hand? A. Had his hand on my private part.

"Q. Where was his face? A. It was up over me.

"Q. About how close was his face to yours? A. Oh, not very far, just a little ways.

"Q. When you discovered that, what did you do? A. I drawed my feet up and kicked him away.

"Q. What, if anything, did he say? A. He says 'Don't do that.'

"Q. Well, what did he do or say while he was up there? A. Well, he said he would make me come to his terms.

"Q. What did you say to that? A. I told him I wouldn't do it.

"Q. What further did he say? A. He said that I would see the time when I would be glad to.

"Q. When you were awakened where was your nightgown? A. It was pushed up.

"Q. Where was it when you retired that night? A. It was down over my limbs.

"Q. State where your father's hands were, or either of them? A. They were on my private parts, one of them was.

"Q. Where was he when you first knew that he was up there? A. He was up over me.

"Q. When your father came up this night of June 30, did he have any clothing on? A. He had on a shirt.

"Q. What kind of a shirt? A. A work shirt.

"Q. And the balance of his body, what condition was that in? A. It was unclothed."

She further testified that appellant came back to her room again that night and said "he had come to make peace;" that he then said to her, "What are your terms?", and she replied, "I am making no terms. I have none to make. Go back downstairs;" that she asked him what his terms were, "and he said that I was to give completely up to him, and he said that if I turned him down and made him blow his brains out, somebody else would go before he did;" that she told him she would give him her answer the next night, and the next day she had him arrested. And she further testified that for almost a year prior to this occasion appellant had made indecent proposals to her and had tried to have sexual intercourse with her. In this connection, she said:

"Well, if occasion came that there was just him and I and no one else around, he would just put his arm around me and then try to put his hands on my private parts."

"Well, on the occasions that he would put his hand up under my clothes and I told him to get away and he said he just wanted to love me."

"Well, he said, 'Are you going to keep treating me this way and never let me love you any?' and I said that I couldn't treat him any other way but the way I had been. I said that he had no right to treat me in such a manner, and it was wrong and harmful, and he said that he did have a right to, they didn't anybody else, but he did. He said I was his and he could do with me as he pleased. He also stated if I missed, to tell him, not to tell my mother, and I told him that I would have nothing to do with him in any way."

"He said that if I loved him, I would let him do what he wanted to, that I wouldn't object to anything that he wanted to do to me."

And it further appears from her testimony that twice during the month of October, 1925, appellant came to her bed upstairs in the nighttime and put his hands on her privates; that in the morning prior to the second of these occasions appellant called to her to get breakfast and she saw him going to the barn with a gun and a milk bucket as she came downstairs; that when she opened the coffee can she found a note in appellant's handwriting and addressed to her, in which he threatened to kill himself unless she submitted to his demands and in which he asked her to hang something white out of her bed-room window if she wanted him "to stay;" that she showed the note to her mother and then put out the sign as suggested; that he came to her room that night, got in bed with her, put his arm around her shoulders and neck, pushed up her gown, got on top of her, tried to force her legs apart, and tried to have intercourse with her; that she tried to get away from him and he said, "Come across, I am not going to have any of that, it's not too late to do what I say;" that he was on top of her "quite awhile" and tried to enter her private parts with his private parts, and that when he got off there was "something damp, wet" on her privates; that appellant weighed about 150 pounds and she weighed about 100 pounds, at that time. And her testimony further shows that she reported all of these occurrences to her mother and that when the sheriff came to arrest appellant on July 1, 1926, she told him of appellant's threats and of his mistreatment of her, in the presence of her mother and other persons. On cross-examination, she admitted that her father had complained about her being out late at night in company with young men and about her dresses being too short, but she denied having any ill-feeling toward her father for any reason except the "improper things" he tried to do to her.

Catherine Pinkard testified that she slept with Christine on the night of June 30, 1926; that she was awakened by Christine's "movement in the bed" and saw her father talking to Christine.

Mrs. Cora Dougherty testified that on July 1, 1926, she telephoned for the sheriff at the request of Christine's mother and heard Christine tell the sheriff that her father attempted to rape her.

Appellant took the stand in his own behalf and denied that he ever solicited Christine to have intercourse with him or ever assaulted her with that intent. He also denied writing the note which Christine said she found in the coffee can and which was offered in evidence by the State. He said he had "some disagreement" with Christine in the summer of 1925 about "her courtship and the way she wanted to dress and go out;" that he "had objected to her being out so frequently at late hours." And he further said that "she just gave me to understand that if she couldn't wear her clothes that way, she wouldn't wear them any way, and proved it by her actions." When asked if she made any threats, he said, "When I told her that she either had to quit being out so late at night or quit keeping company, she said she could quit but I would regret it."

Appellant's sister, Mrs. Yowell, was offered as a witness in his behalf and testified that, while she was at appellant's home in the fall of 1925, Christine told her of appellant's proposals of intercourse, but said nothing about his coming to her room.

Mrs. Haner, appellant's aunt, was another witness in his behalf. She testified about the contents of a letter written by Christine to her, which she was unable to find and produce at the trial. She said Christine stated in the letter that "they had daddy arrested as a last resort, that he had threatened to kill them, and that he was going to put his threats in execution;" and also that Christine's letter stated, "So far as daddy touching me, he never touched me."

Seven of appellant's neighbors and acquaintances testified to his good reputation for morality and his good treatment of his family.

I. Learned counsel for appellant vigorously attack the sufficiency of the evidence. They contend with great earnestness that the evidence presents only a case of solicitation and attempted persuasion and fails to show appellant's intention to accomplish his purpose at all hazards and to overcome any and all resistance; and that, therefore, there is a failure of proof to support the charge of assault with intent to commit rape on which he now stands convicted.

Assuming counsel's view of the facts to be correct, their contention is sustained by well established authority in this State. But, as we view the facts, the cases on which they rely have no application here. True, appellant did, for a long time, solicit and attempt

to persuade the prosecutrix to allow him to have sexual intercourse with her, but he did not stop there. His repeated and persistent efforts along this line were intermingled with threats of violence and other acts calculated to intimidate her. Twice before the assault in question, in October, 1925, he made similar attacks and attempted to accomplish his purpose while she was asleep. Of course, this evidence was only admissible to show his criminal intent and the trial court properly instructed the jury to that effect. On the night of June 30, 1926, the time of the assault alleged in the information, the prosecutrix, when aroused from her sleep, found appellant up over her, on his knees, with no clothing on except his work shirt, with his face close to her face, with her nightgown pushed up, with one of his hands on her privates.

This court, in a long and unbroken line of decisions, has held that evidence of this character is sufficient to sustain a conviction for assault with intent to commit rape. In the case of State v. Shroyer, 104 Mo. l. c. 446, 16 S. W. l. c. 287, the rule to be applied here is discussed by MacFarlane, J., in the following language:

"Defendant insists that the evidence did not sustain the charge of the indictment, and does not justify the verdict. It was not necessary in order to constitute an assault, that actual violence should have been used. To sustain such an indictment it is not even necessary that the person of the one upon whom the attempt is intended should be touched. If the intent, with the present means of carrying it into effect, exists, and preparations therefor have been made, the assault is complete. [State v. Smith, 80 Mo. 518; State v. Montgomery, 63 Mo. 296; State v. Eddings, 71 Mo. 545; 1 Wharton, Crim. Law, sec. 576.]

"It was the evident intention of defendant to have connection with the girl without her consent, and whether it was to be by actual physical force, or during the unconsciousness of sleep, is wholly immaterial. There could have been no consent while the intended victim slept. [State v. Eddings, 71 Mo. 545; Queen v. Dee, 31 Alb. L. Jour. 43; Reg. v. Meyers, 12 Cox. Crim. Cas. 311; Harvey v. State, 14 S. W. 645; State v. Smith, 80 Mo. 518, and authorities cited.] The acts and conduct of defendant left no doubt of his criminal intent."

It will be noted that the ruling in the Shroyer case follows previous rulings of this court. The Shroyer case and the earlier cases referred to therein are cited approvingly in the comparatively recent cases of State v. Comer, 296 Mo. l. c. 10, 247 S. W. l. c. 181, and State v. Shaw, 220 S. W. l. c. 864. See, also, State v. Dalton, 106 Mo. 463, 17 S. W. 700; State v. Alcorn, 137 Mo. 121, 38 S. W. 548; State v. Hoag, 232 Mo. 308, 134 S. W. 509; State v. Pierce, 243 Mo. 524, 147 S. W. 970.

When the prosecutrix in this case was awakened, appellant was in a position to accomplish his purpose and he then told her that he would make her come to his terms. The fact that she drew up her feet and kicked him away and was resolute enough to successfully resist his attack does not purge him of the crime which he intended to commit when he began the assault. And then, it must also be remembered that, about the time the prosecutrix kicked appellant, his younger daughter, Catherine, was awakened by her "sister's movement in the bed." The discovery by appellant that Catherine was awake and watching him may have caused him to abandon his felonious purpose. As was said by Judge MacFarlane in the Shroyer case, above quoted, the rule is that *"if the intent, with the present means of carrying it into effect, exists, and preparations therefor have been made, the assault is complete;"* (Italics ours.) And as was said by Judge Ferriss in State v. Bowers, 239 Mo. l. c. 436, 144 S. W. l. c. 98: "This proposition of law contains two essential elements of fact. There must be an intent to commit the offense, and. the means must be present to carry this intent into effect. The intent, however, can only be discovered by the facts and circumstances . in the case, and when the actions of a person indicate that he is animated by a certain intent, it is fair to presume that such intent exists." Applying. this rule to the plain, outstanding facts and circumstances in the record before us, it is apparent at once that the evidence not only presented a case for the jury, but is amply sufficient to support their finding. And this, either on the theory that appellant intended to rape the prosecutrix while she was asleep, or by sufficient force to overcome all resistance if she was awakened by his assault. On. the latter theory, it was clearly for the jury to say whether appellant abandoned his intention to commit the crime when he was "kicked away" by the prosecutrix and when he discovered that his younger daughter, Catherine, was awake and in a position to observe what was going on.

Counsel further contend that the story of the prosecutrix is too unreasonable for belief. This is not persuasive. The prosecutrix reported promptly to her mother all of appellant's improper proposals and all of his assaults on her, including the assault in question. She told. her aunt, Mrs. Yowell, of appellant's proposals of sexual intercourse, in the. fall of 1925. She is corroborated, in part, by her sister, Catherine, as to what happened on June 30, 1926, the time of the alleged offense. We concede that it seems strange and unnatural for a father to attempt to defile his own daughter, whose purity he should protect at any cost, and yet, the pages of history record many examples of such depravity. Moreover, it seems equally. strange and unnatural that a timid country girl, less than seventeen years of age, would enter a court room and swear falsely against her own father

in a matter of this kind. But, whether she testified truthfully, or falsely, for other reasons, was another question for the consideration of the jury. It is elementary that the jury passes upon the weight of the evidence and the credibility of the witnesses, and where, as in this case, there is substantial evidence to support the verdict, this court will not interfere. Appellant's instructions in the nature of demurrers to the evidence were properly refused.

II. The complaint that instructions numbered 2 and 3 commented on the evidence is without merit. After a careful examination of these instructions, we deem it unnecessary to quote them. Instruction 2 correctly declared the law on assault with intent to commit rape, as applied to the facts of this case. In Instruction 3, a conviction for common assault was predicated on the finding by the jury that there was an assault committed, but not with the intention of committing rape. This instruction, also, correctly declared the law as applied to the facts of the case. [State v. Shroyer and State v. Comer, supra.] In connection with this complaint on the part of appellant, it should be noted that the learned trial judge endeavored to guard against any prejudicial error by way of comment on the evidence in the instructions to the jury. In Instruction 1 he very properly charged the jury as follows:

"You must not consider any of the instructions as an expression or intimation of what the court thinks of the evidence, because you are the sole judges of the facts herein, and you must ascertain them yourselves from the evidence before you, under your oath as jurors."

III. The motion for a new trial contains general assignments of error as to the admission and exclusion of evidence and as to given and omitted instructions, but these assignments do not specify with any degree of detail or particularity the matters complained of. Under the present rule, such assignments present nothing for our review. [Laws 1925, p. 198; State v. Standifer, 289 S. W. 856; State v. Murrell, 289 S. W. 859.]

IV. It is asserted in the motion for a new trial that the jury considered and were influenced by the fact that appellant's wife committed suicide after his arrest on this charge, though such fact did not appear in evidence. We find nothing in the record to support this assertion and it will, therefore, be disregarded. Mere assertions in a motion for a new trial do not prove themselves. [State v. Baird, 297 Mo. 219, 248 S. W. 596; State v. Creeley, 254 Mo. 382, 162 S. W. 737.]

V. The information is sufficient in form and substance. [State v. Payne, 194 Mo. 442, 92 S'. W. 461; State v. Neal, 178 Mo. 63, 76 S. W. 958.]

VI. The verdict in this case is assailed, both in the motion for a new trial and in appellant's brief, on the ground that "there isn't a thing in this verdict that would identify this appellant with the person convicted." It reads as follows:

"We, the jury find the defendant guilty as charged in the information and assess his punishment at four (4) years' imprisonment in the penitentiary.

"JOHN SPROUL, Foreman."

Counsel argue in this brief that "this verdict is so general it might apply to any defendant in any felony case." This argument cannot be seriously considered. There was only one charge in the information and only one defendant on trial. The record shows that this verdict was returned, read in open court, filed and recorded as the verdict in this case. We think the record leaves no room for doubt as to the identity of the person convicted. General verdicts in this form have been approved in innumerable decisions of this court. [State v. Julin, 292 Mo. 264, 235 S. W. 818; State v. Bishop, 231 Mo. 411, 133 S. W. 33; State v. Shour, 196 Mo. 202, 95 S. W. 405.]

After a painstaking examination of the entire record, we find no error, and it is our conclusion that appellant was accorded a fair and impartial trial. The judgment is affirmed. *Higbee* and *Davis*, *CC.*, concur.

PER CURIAM:—The foregoing opinion by HENWOOD, C., is adopted as the opinion of the court. All of the judges concur.