STATE v. SHERMAN THOMAS, Appellant.—No. 38550.—174 S. W. (2d) 337.

Division Two, October 4, 1943.

*Charles Farrar* and *Phil M. Donnelly* for appellant.

*Roy McKittrick,* Attorney General, and *L. I. Morris,* Assistant Attorney General, for respondent.

ELLISON, J.—The appellant was convicted by a jury in the Laclede county circuit court of assault with intent to rape. His punishment was assessed at two years' imprisonment in the penitentiary. We take up in their order his briefed assignments of error, stating the facts applicable to each in the discussion thereof.

Appellant's first contention is that his challenge to the poll of Ferrell Burns, a member of the jury panel, should have been sustained under Sec. 4057, R. S. 1939, Mo. R. S. A., sec. 4057, because Burns stated in his voir dire examination that his sister was the wife of a brother of the prosecutrix' husband. In other words, he was a brother-in-law of a brother-in-law of the prosecutrix. The statute provides that in criminal prosecutions no person "of kin" to the "injured party" or to "the prosecutor or defendant" shall be competent to serve as a juror on the trial of the cause. The prosecutrix here was both the "prosecutor" (who signed the complaint) and the "injured party" (who was allegedly assaulted). She therefore came within the statutory designation.

But the statute does not specify how the prosecutrix and the juror must be related: whether by consanguinity or affinity. He was not related by consanguinity. Was he, by affinity? In State v. Carter, 345 Mo. 74, 77(3), 131 S. W. (2d) 546, 548(4), a female cousin of the juror's wife had married a brother of the defendant. The case ruled this did not constitute a relationship forbidden by the statute. The same ruling must be made here. A kinship by affinity—arising through marriage—exists only between each *spouse* and the *blood* relatives of the other spouse.[1] Here, juror Burns was not blood kin of the prosecutrix' husband, and therefore was not related to her by affinity. It results that he was not of kin to her at all, and the assignment must be overruled.

The next assignment raises a similar question. Charles Atkinson, one of the twelve jurors chosen from the panel, was the husband of the daughter of appellant's first cousin, and consequently by affinity appellant's second cousin, or first cousin once removed.[2] On the voir dire examination of the jury panel the prosecuting attorney had asked the general question: ''Are you related by blood or marriage to Mr. Thomas (the appellant) or Mrs. Nyberg (the prosecutrix)?'' Atkinson remained silent although he must have heard the examination of juror Burns, referred to in the last paragraph, and the discussion between the court and counsel regarding his relationship to the prosecutrix. Furthermore, all the jurors were asked if they were acquainted with the appellant, who was pointed out to them, and Atkinson said nothing although others spoke up.

His kinship was not discovered until after the first day of the trial, during which the State had completed its case in chief, and the defense had concluded the examination of two witnesses. The next morning the prosecuting attorney, in the absence of the jury, informed the court that such information had come to him. Appellant's counsel. [339] were ignorant about it and inquired of the appellant who told them he did not know of it. Upon investigation they ascertained the information was correct, and neither the juror nor the appellant was questioned further thereon. The juror was never asked if he *knew* of the relationship. The prosecuting attorney withdrew his objection, but appellant's counsel challenged the juror under Sec. 4057, supra, and moved for a mistrial. The motion was overruled and error is assigned on that ruling.

Three questions arise on these facts: (1) was the juror within the degree of relationship banned by the statute; (2) if he was can the appellant complain, since the juror was his own kinsman, not that of the prosecutrix, and the State had withdrawn its objection; (3)

[1]16 Am. Jur., sec. 53, p. 825; 26 id., sec. 2, p. 631; 2 C. J., p. 377-8; 2 C. J. S., p. 991; 2 Words & Phrases (Perm. Ed.), "Affinity," p. 660.
[2]99 A. L. R., p. 672, note; 10 Words & Phrases (Perm. Ed.), p. 279; 17 id., p. 64; 38 id., p. 429; Webster's New International Dictionary, "cousin."

and if the appellant otherwise might have complained, did he waive the point by failing to raise it until after the State had presented its case in chief and the trial had progressed for a day. The statute,[3] Sec. 4057, is as follows:

"Where any indictment or information alleges an offense against the person or property of another, neither the injured party nor any person *of kin* to him shall be a competent juror on the trial, nor shall any person *of kin* to the prosecutor or defendant in any case serve as a juror on the trial thereof."

What degree and kind of relationship is contemplated by the indefinite words "of kin" in this statute? State v. Lewis, 323 Mo. 1070, 1082, 20 S. W. (2d) 529, 533, treated the section as in pari materia with another, which it designated as Sec. 4023, R. S. 1919; and said the latter was "an additional statute, general in its nature and applicable alike to civil and criminal cases." Then it proceeded to quote the "additional statute," which is now Sec. 722, omitting the first clause thereof—enclosed in parentheses below—as follows:

(No witness or person summoned as a witness in any civil cause, and) "no person who has formed or expressed an opinion concerning the matter, or any material fact in controversy in any such cause, which may influence the judgment of such person, or who is of kin to either party to any such cause *within the fourth degree of consanguinity or affinity,* shall be sworn as a juror in the same cause."

But the Lewis case erred, through oversight, in making the foregoing statement. The present Sec. 722 was *not* Sec. 4023 in the Revision of 1919, but Sec. 6632. And it does *not* apply to civil and criminal cases alike, but to civil cases only, as the first clause of the section (omitted from the foregoing quotation in the Lewis case) plainly shows. The mistake came about in this way. The Lewis case relied on State v. Meininger, 290 S. W. 1007, as authority. That decision did cite Sec. 4023, R. S. 1919, and did say it applied to both civil and criminal cases, which is true. But said Sec. 4023, R. S. 1919 (now Sec. 4068) has nothing to do with the *qualifications* of jurors. It applies only to the *impaneling* of the jury, keeping them together and the manner of rendering their verdict. That was the point on which the Meininger case cited it, at the same time expressly holding these matters were *not* grounds of disqualification or challenge, and referring to the very statute here in question (Sec. 6632, R. S. 1919, now Sec. 722). In short, the Lewis case simply was mistaken in quoting said Section 722 as if it were Sec. 4023, R. S. 1919; and in applying the provision in the latter that the proceedings in civil and criminal cases should be the same, to the provision in the former dealing with the competency of jurors.

---

[3] All italics in quotations are ours, and all references to statutes are to R. S. Mo., 1939, and the same section numbers in Mo., R. S. A., unless otherwise indicated.

The history of this legislation, also, points to the conclusion that the provisions about kinship in Secs. 4057 and 722 have nothing in common. Before statehood and up to 1835 we had only one statute dealing with the competency of jurors.[4] It was phrased somewhat like the present Sec. 722, but said nothing about any disqualification of jurors because of kinship between them and the litigants. When our first criminal code was adopted in 1835, the Legislature departed clear away from the former statute, and enacted Sec. 8, p. 490, R. S. 1835, making it read, in the respects here under consideration, identically as Sec. 4057 does now, and thus introducing the indefinite provision that a juror shall not be "of kin" to the injured party, prosecutor or defendant. The same Revision in the Article on Practice at Law contemporaneously redrafted the former statute as Sec. 16, p. 463, R. S. 1835. This new section was substantially in the language of the first part of [340] the present Sec. 722; but it did *not* include any provision about kinship between the jurors and litigants. That provision was first inserted ten years later in Sec. 12, p. 628, R. S. 1845, so that it read exactly as Sec. 722 does now.

This leaves us where we began, with no definition of the expression "of kin" in Sec. 4057. It is singular that this should be true, with more than a century of judicial history behind us; and that the same should be true of the phrase in Sec. 722, "kin . . . within the fourth degree of consanguinity or affinity." In this situation we are cast mainly on general authority and the common law, though we do not entirely ignore Sec. 722, notwithstanding what is said in the preceding paragraphs. For while prior or contemporary legislation is more often consulted in the interpretation of a particular statute, yet subsequent legislation sometimes may be. 59 C. J., sec. 619, p. 1041, sec. 620, p. 1048-9; 25 R. C. L., secs. 286-288, pp. 1062-1064.

There are two methods of reckoning degrees of consanguinity: the canon law, and the civil law. Under the canon law the number of generations is counted from the common ancestor down to the farther-est of the two descendants whose degree of relationship is to be ascertained. Under the civil law the count *ascends* by generations from either of the two relatives to the common ancestor and thence down the collateral line to the other. The reckoning by the civil law would be just double that under the canon law, as applied to relatives removed an equal number of generations from the common ancestor. Thus, brothers would be related in the 1st degree under the canon law, and in the 2nd degree under the civil law; first cousins similarly in the 2nd and 4th degrees; second cousins in the 3rd and 6th degrees, etc. But the child of one of two first cousins (as here) would be related

---

[4] 1 Terr. Laws (1804-1824), p. 447, sec. 7; id., p. 851, sec. 43; 2 R. S. Mo., 1825, p. 630, sec. 36; 2 Terr. Laws (1824-36), p. 96, sec. 4.

to the other cousin in the 3rd or 5th degree, respectively, because one generation further removed from the common ancestor.[5]

The rule seems to be settled that under the common law a juror was disqualified if related to either of the parties within the ninth degree of consanguinity or affinity under the civil rule; and that this was a ground of "principal" challenge—that is, of challenge on the ground of presumptive prejudice alone, without any showing of actual prejudice.[6] There is good reason for thinking the indefinite words "of kin" in Sec. 4057, supra, should be construed in the light of this rule of the common law in force at the time of its passage; for that is an accepted canon of statutory construction.[7] This is true unless that conclusion is overborne by the other heretofore mentioned, namely that the criminal statute, Sec. 4057, and the civil statute, Sec. 722, should be construed together and taken to have the same meaning.

We have already explained why we think the Lewis case, supra, is not good authority for the latter conclusion. But that same view was taken in the Churchill case from Vermont, just cited in marginal note 6. In that state there was no statute disqualifying jurors because of kinship to the defendant in a criminal case, and the common law was in force. There was, however, a statute, 1 R. S. Vt. 1839, sec. 25, p. 162, disqualifying *judges* who were related within the *fourth* degree of consanguinity or affinity to either of the parties. The Vermont Supreme Court held this statute evidenced a legislative intent that the same rule should cover all similar litigatory situations, and therefore applied to jurors [341] in a criminal case. It further ruled the degrees of consanguinity should be reckoned by the civil rule, under which the fourth degree would only reach first cousins. The juror there was by affinity a first cousin once removed of the defendant, and therefore related in the *fifth* degree under the civil rule. So the court refused to disqualify him. By the same reasoning juror Atkinson was competent in this case.

[5]16 Am. Jur., sec. 55, p. 826; 18 C. J., sec. 28, p. 823; 26 C. J. S., sec. 22, p. 1028; 12 Am. St. Rep., p. 107, note; 2 Blackstone's Commentaries (Lewis' Ed.), p. 673, *p. 206; 4 Kent's Commentaries (14 Ed.), p. 473, *p. 412(2); 1 Erskine's Institute of the Law of Scotland, sec. 8, p. 122-3; 1 Bouvier's Law Dictionary (Rawle's 3 Ed.), "Degree," p. 818; 1 Burrill's Law Dictionary, "Degree," p. 464.

[6]31. Am. Jur., sec. 134, p. 660; 35 C. J., sec. 331, p. 317; 3 Blackstone's Comm. (Lewis' Ed.), p. 1322, *p. 363; 2 Tidd's Practice, *p. 853; 1 Chitty, Criminal Law, p. 541; Thompson-Merriam on Juries, sec. 178 (secs. 1, 6), pp. 180, 183; 1 Thompson on Trials (2 Ed., Early), sec. 61, p. 62; 2 Bishop, Crim. Proced. (2 Ed.), sec. 901, p. 694; Abbot's Trial Briefs, Crim. Causes, sec. 232, p. 130, sec. 250, p. 135; Abbot's Civil Jury Trials (5 Ed.), sec. 72, p. 151; Crawley v. State, 151 Ga. 818, 108 S. E. 238, 18 A. L. R. 368; Roberts v. Roberts, 115 Ga. 259, 261, 41 S. E. 616, 617, 90 Am. St. Rep. 108, 110; State v. Wall, 41 Fla. 463, 26 So. 1020, 79 Am. St. Rep. 195; Churchill v. Churchill, 12 Vt. 661, 666.

[7]25 R. C. L., sec. 279, p. 1053; 59 C. J., sec. 617, p. 1039; State v. Wolfner, 318 Mo. 1068, 1076, 2 S. W. (2d) 589, 592(3); Perry v. Strawbridge, 209 Mo. 621, 637, 108 S. W. 641, 645(4), 123 Am. St. Rep. 510, 16 L. R. A. (N. S.) 244, 14 Ann. Cas. 92.

812

On the other hand, the Crawley case, cited in marginal note 6, says that by statute in Georgia a judge is disqualified if related to either party within the fourth degree, computed by the canon law; that by judicial decision jurors in civil cases are similarly disqualified; but that in criminal cases jurors are disqualified under the common law if related by consanguinity or affinity within the ninth degree computed by the civil law.

We think the Georgia doctrine is more applicable under our decisions, the history of the legislation and the provisions of the statutes, themselves, since Sec. 4057 expressly applies only to criminal cases and Sec. 722 only to civil cases. As stated, the Vermont doctrine using the civil rule extends only to *first* cousins. But State v. Walton, 74 Mo. 270, 285, held a juror was disqualified under (now) Sec. 4057, who was a *third* cousin of the defendant in a criminal case—a relationship in the 4th degree under the canon law and in the 8th degree under the *civil* law. And in Pemiscot Land & Cooperage Co. v. Davis, 147 Mo. App. 194, 200, 126 S. W. 218, 220, the juror was a *second* cousin of the wife of one of the defendants in a civil case, and it was held he was disqualified. This could have been true only under the *canon* law. In State v. Miller, 331 Mo. 675, 681(5), 56 S. W. (2d) 92, 95 (6-8), the juror's wife was the second cousin once removed of the murdered woman. The opinion states this made him related to the deceased by affinity in the 4th degree, and that his wife was related to her by consanguinity in the 7th degree, thus counting by *both* the canon and civil law rules. The decision held the juror would have been disqualified under Sec. 4057—if he had known of the relationship.

In the Walton and Miller cases, just cited, and in the instant case, the juror was within both the 4th degree of relationship by the canon law and the 9th degree by the civil law. But in view of what has been said in this discussion we think Sec. 4057 is simply declaratory of the common law and that relationships thereunder should be reckoned by the civil law rule; whereas those under Sec. 722 are to be computed under the canon law. However, this distinction is little more than technical where the two relatives are removed an equal number of generations from the common ancestor.

On the other point in this connection. It is stated in 35 C. J., sec. 331, p. 318, that in the absence of statutory provision as to the *degree* of relationship, the question to be determined is merely the probability of *actual* prejudice resulting therefrom. In other words the *fact* of kinship is not a ground of principal challenge, and the *effect* of it is the only question. Six decisions from four states are cited. We have examined these and find that in two of them there was no statute at all concerning jurors. In South Carolina the statute only governs the voir dire *examination* of jurors for relationship, fixed opinion, bias, etc. That is vastly different from our Section 4057, which provides specially and solely that the juror shall not be "competent" or

"serve" if "of kin" to the persons designated. True it does not specify what degree of kin; but it can hardly be thought the Legislature would have enacted Sec. 722 fixing a limit at the 4th degree in civil cases; and yet intend by Sec. 4057 to leave the question entirely to the judge in criminal cases where the issues are so much more vital. We hold juror Atkinson was incompetent under the terms of Sec. 4057, unless it should be ruled otherwise for the reasons stated in the next two paragraphs.

In the instant case the juror was not of kin to an adverse party, but to the appellant, himself, who made the motion for mistrial. Was that a valid ground of principal challenge? The following statement is made in 35 C. J., sec. 331, p. 318: "A party cannot, it seems, object that a juror is related to him." So, also, 31 Am. Jur., sec. 134, p. 660, declares: "It is a general rule that one related, within a prohibited degree, to a party in a case is disqualified to serve as a juror on such case and is subject to challenge by the *adverse* party." In our opinion the rule as thus stated is founded in reason. The common law theory of such principal challenges was that the fact of relationship spoke for itself without proof of actual prejudice, "for that" as Lord Coke put it, "the law presumeth that one kinsman doth favor another before a [342] stranger"; or, as one decision says, because "blood is thicker than water."[8] If that be the reason behind the statute, then certainly it cannot be invoked by one who presumptively is helped, not hurt, by the relationship—especially since the statute is only declaratory of the common law. And we so hold.

The third question stated above under this head was: did appellant *waive* the incompetency of juror Atkinson, by failing to raise the point until after the State had presented its case in chief and the trial had progressed for a day. Since we have held in the preceding paragraph that the statute afforded no ground for a principal challenge by appellant of his own relative, this question is eliminated from the case. There was no such right to be waived. It is true the appellant here did not know of juror Atkinson's relationship to him, and made timely objection as soon as he learned of it. But he confined his objection solely to the fact of that relationship as a statutory ground, and does so here in his brief. The juror was not further interrogated (outside the statute) in an effort to prove actual adverse prejudice. By his silence during the voir dire examination he had denied it, as well as any knowledge of the relationship. This whole assignment must be overruled.

The next assignment complains of the trial court's failure to give appellant's peremptory instruction in the nature of a demurrer

[8] 1 Coke's Littleton (Butler & Hargrave's Notes), Note 157a, on Book 2. Chap. 12, Sec. 234; State v. Harris, 69 W. Va. 244, 245, 71 S. E. 609, 50 L. R. A. (N. S.) 933, 937, 969(2), note; 26 Ann. Cas. 889, 890; Wright v. Smith, 104 Ga. 174, 30 S. E. 651; State v. Ketchey, 70 N. C. 621, 623-4.

to the evidence at the close of the whole case—this on the theory that the evidence failed to show he assaulted the prosecutrix with intent to ravish her by overcoming her utmost resistance. The prosecutrix and her husband, Lloyd Nyberg, had been married 20 years and had six children, 4, 6, 9, 11, 14 and 18 years of age. He was a welder in a machine shop at Lebanon, and also drove the school bus. They and appellant's family had lived for ten years on adjoining farms with their homes about 150 yards apart, "within hollering distance," and with nothing intervening to obstruct the view. On Sunday morning, June 7, 1942, Mr. Nyberg had been called to Lebanon to do some welding. The appellant came over and helped him load a veal calf in the truck. Mr. Nyberg and his 14-year-old son then left, the appellant riding with them as far as his own barn. The eldest son was away. This left the youngest four Nyberg children at home. The younger two were playing at appellant's home; the other two had gone to the mail box about a quarter of a mile away.

Mrs. Nyberg testified she was sweeping the bedroom when appellant returned to her home and entered the room. He seized her and threw her on the bed, declaring he was going to have sexual intercourse with her. She resisted and scratched him until nearly exhausted; and then resorted to the ruse of proposing that if he would let her get up she would hook the door. When freed she ran outside instead, and called her two young children from appellant's home. On cross-examination she testified appellant did not try to pull her clothes up; offered no physical violence except just wrestling and holding her down; and that he tried to "calm her down," or get her to give in. The appellant denied that he returned to the Nyberg home after he had helped Mr. Nyberg load the calf and gone back to his own home. To the contrary he and his wife both testified that shortly afterwards they drove over to the home of appellant's brother and stayed there until late that Sunday afternoon. And his wife said there were no scratches on his face immediately after the alleged assault.

Appellant also stresses the prosecutrix' failure to make outcry and her subsequent conduct. She did not tell her husband or any one else about the alleged assault for more than seven weeks, until on or about July 27. During the intervening time the two families continued their friendly relations as before. The prosecutrix ate dinner with appellant's wife at the latter's home on one occasion. Later, the appellant fixed the ground for a strawberry bed at the prosecutrix' home and helped set out the plants, which took two or three hours. Still later he worked the ground for a sweet potato patch for about an hour and a half, coming to her house and talking to her and her sister-in-law. Another time appellant helped her son plow the garden and do some planting, and also during oats harvest. On that occasion the prosecutrix had appellant and his wife in for dinner. [343] On July 5 she took some presents to appellant's wife for her birthday.

Her elder two sons went squirrel hunting with appellant, starting from her home. Several times the prosecutrix and her husband had the appellant and his family ride with them to a country store in the school bus. Prosecutrix and two of her daughters and the appellant ate dinner at her mother's, Mrs. Nostrum, while he was plowing the mother's strawberry bed. Later appellant was at the mother's home during her birthday dinner, but did not eat there. It was while he was hauling rocks for her. And once appellant took one of the prosecutrix' sons to see a school director, who was his brother. The prosecutrix testified to all this on cross-examination. In fact she said: "We couldn't do anything down there (at the garden) without he was down there;" and that ever since April appellant had been coming uninvited to the well by her house while her husband was away, to get water, maybe as much as a dozen trips a day, sometimes, and on each occasion visiting with her. He just couldn't pass without stopping.

The prosecutrix' version of how the denouement came about was as follows. She had kept the assault a secret because she wanted to give appellant a chance to do better; and she was afraid a disclosure would lead to violence between her husband and him. But a few days before July 27 she discovered appellant was jealous of her. He accused her of having or seeking sexual relations with men other than her husband, mentioning one Lowery in particular. On the morning of July 27 appellant came to the prosecutrix' kitchen door. Both the door and the screen were locked. He tore the screen loose and lunged through the upper part of the door where the glass panel had previously been broken out, landing on his feet on the kitchen floor. This opening was more than five feet above the ground, counting the small step up to the door sill, according to appellant's evidence. Inside the house appellant made a pretended search for a man, even going upstairs, and again accused her of sexual relations with Lowery.

The prosecutrix complained to her husband the next day (July 28) about this invasion of her home and appellant's accusations, but still did not disclose to him the previous attempted rape charged here. Her husband and appellant had a fight about the jumping-through-the-door incident that evening after which she and her husband on the following day (July 29) complained to the prosecuting attorney about that. Then, for the first time, she told the prosecuting attorney about the attempted rape before she had told her husband. The prosecuting attorney called the appellant in the next day (July 30) and talked to him about the charge. The prosecutrix swore to a complaint against him that day.

Appellant agreed that he was at the prosecutrix' home on July 27 but denied jumping through the door and searching the house. He said they talked about getting someone to substitute for her husband in driving the school bus; and admitted telling her on that occasion

he thought she was "getting awfully thick" with Lowery. Shortly before that he had discovered that a certain contraceptive article he had left in her home had been used at a time when Lowery was there. Appellant declared he had been sustaining illicit sexual relations with the prosecutrix for two years; and that he had given her a skirt, a waist, two sweaters, a dress, some galoshes, a coat with a fur collar, a night gown and money. Being asked about the size of some of these garments—whether they were size 36 or 38—he said he guessed at the size when he bought them. Some she bought with money he furnished.

·Another fact that figured prominently in the testimony concerned an insurance policy for $1000 on appellant's life, which he had purchased in July, 1940, naming his wife as beneficiary therein. He testified that he talked to the prosecutrix about changing it and making it payable to her children "as an alibi," she being the intended beneficiary. He consulted the agent about substituting her son as the beneficiary, saying the boy had stayed with him a lot, and that the Nybergs had always done things for him. The agent suggested if he died the boy would get the money. A month or two later in August, 1941, he had the policy made over to the prosecutrix "Gertrude Nyberg, friend." He said he turned the policy over to her and she kept it for 10 or 12 months and got it back "a short time ago" (before the trial). The policy was introduced in evidence and there is no dispute about the fact that the beneficiary was changed as stated above. The [344] State's theory is that appellant really did this for the prosecutrix' children.

The prosecutrix in rebuttal denied having clandestine relations with appellant and practically all the rest of his accusatory testimony. She said she bought the coat with the fur collar from appellant and his wife because it was too small for the wife; that he never gave her money or bought clothes for her, and that the dress sizes he mentioned were much too large for her; but that he always was buying something for her children. She denied that appellant gave her an insurance policy or that she had or kept it. But she admitted seeing an envelope that he said the policy was in. He showed it to her the morning he jumped through the door. The year before he had talked to her about taking out a policy payable to her children, and said if he died it would take care of both her children and his wife; that his own relatives would not take care of his wife.

The prosecutrix averred that after this criminal prosecution was started the appellant repeatedly tried to get her to stop it, saying if she did not he would blacken her character. She ascribed to this purpose his story about the contraceptive devices. Sheriff Jones in rebuttal for the State testified that at his request appellant came to the prosecuting attorney's office, and in the presence of both officials admitted he was at the prosecutrix' home on June 7, the date of the alleged assault, and there had intercourse with her with her consent;

but denied the assault. The appellant denied making this admission, and, as heretofore stated, denied he was at the prosecutrix' home at the time of the alleged assault. There was testimony on both sides on other incidents, but we cannot set out all of it. The foregoing will suffice to outline the showing made by the prosecution and defense.

On this assignment, that the court erred in refusing to give appellant's peremptory instruction in the nature of a demurrer to the evidence at the close of the whole case, the State's brief merely argues that when a defendant does not stand on his demurrer at the close of the State's case, but introduces evidence in his own behalf, he takes the chance of helping the State's case. That is true; but the brief does not attempt to show the State made a prima facie case on the whole record. There are several parts of the testimony on both sides that seem incredible. The prosecutrix' account of appellant's making the athletic jump through the door is one; her story that appellant wanted to make her children beneficiaries in his life insurance policy in order to protect his own wife—when the policy already ran to the wife—is another. Her tolerance of his attentions both before and after the alleged assault, and her failure for seven weeks to make disclosure of that fact to her husband until after the Lowery incident arose, are still others. On the other hand, the appellant's statement that he bought clothes for the prosecutrix, guessing at the size, is hard to credit. He was, furthermore, impeached by the sheriff in his sworn denial that he was at the prosecutrix' home at the time of the alleged assault.

However, the point upon which the State's case is the weakest is the lack of evidence that the appellant intended to accomplish his purpose by force against the will of the prosecutrix and by overcoming her utmost resistance. He did declare he intended to have intercourse with her and threw her on the bed, he being on her body. But he offered her no physical violence other than "just wrestling." His own clothing was not disarranged, so far as the evidence shows, nor did he attempt to disarrange her's. She, herself, testified he was trying to "get me to calm down," or "trying to get me to give in, I guess, to what he said he was going to do." The undisputed evidence shows he was infatuated with her, or jealous of her, as she testified. Her two daughters, 9 and 11 years old, were around the home—that is they had gone to the mail box about one-fourth mile away, inferentially would be back soon, and in fact did return before appellant left. The youngest two children, 4 and 6 years old, were playing at the appellant's home "within hollering distance, and had already been gone for half an hour." Indeed, when appellant entered the room the prosecutrix first thought it was her children.

It seems to us this evidence is even stronger for appellant than that in State v. Williams, 324 Mo. 179, 22 S. W. (2d) 649, where the evidence was held insufficient; and much weaker than that in State v.

Pinkard, 318 Mo. 751, 300 S. W. 748, and State v. Knoch (Mo. Div. 2), 14 S. W. (2d) 424, where the evidence was held ˙sufficient. **[345]** The facts in the latter case are not very fully stated, but it does say the accused there "tried to have sexual intercourse" with the woman involved, and she was "holloaing" and told her husband as soon as possible.

It is true a prima facie case of rape or attempted rape can be made on the uncorroborated testimony of the prosecutrix. Most of the decisions so holding were for rape of a female under the designated statutory age (now 16 years). That question is not in this case. At least it can be said where the prosecutrix is a mature woman and the case is weak there should be corroboration.[9] In such cases the defendant is entitled to a proper cautionary instruction advising the jury that the failure of the prosecutrix to make a complaint seasonably after the assault is a circumstance for their consideration along with the other facts in evidence.[10]

In the instant case the defendant did offer two such cautionary instructions, C and D, which the trial court refused and the appellant assigns error on that ground. The State's brief does not criticise the form of the instructions but merely cites State v. Benson (Mo. Div. 2), 8 S. W. (2d) 49, 54(8), a homicide case, which states only the general proposition that it is not error to deny a requested instruction when it is covered by other proper instructions given. The brief says appellant's two refused instructions were covered by instructions No's. 3 and 6, given on behalf of the State. Instruction 3 merely told the jury that if the appellant had intercourse with the prosecutrix with her consent, then they should acquit him; and Instruction 6 was on the credibility of witnesses. We are unable to agree that these two State's instructions sufficiently covered the subject matter of the appellant's two refused instructions, one of which, Instruction D, was in proper form in our opinion.

For this reason the judgment is reversed and the cause remanded. All concur.

---

[9]State v. King, 342 Mo. 975, 984(4), 119 S. W. (2d) 277, 281; State v. Ball (Mo. Div. 2). 133 S. W. (2d) 414, 415; State v. Wade, 306 Mo. 457, 466-7, 268 S. W. 52, 54; State v. Tevis, 234 Mo. 276, 284, 136 S. W. 339, 341; State v. Goodale, 210 Mo. 275, 282(II), 109 S. W. 9, 11.

[10]State v. Richardson, 349 Mo. 1103, 1111(5), 163 S. W. (2d) 956, 961(10); State v. Palmer, 344 Mo. 1063, 1066-7, 130 S. W. (2d) 599, 601(5); State v. Taylor, 320 Mo. 417, 431(b), 8 S. W. (2d) 29, 35(21); Champagne v. Hamey, 189 Mo. 709, 722, 725, 88 S. W. 92, 95, 97.