STATE v. ESKILL MARSHALL, Appellant.—No. 39450.—189 S. W. (2d) 301.

Division Two, September 4, 1945.

*Louis A. Reale* for appellant.

*J. E. Taylor,* Attorney General, and *Will F. Berry, Jr.,* Assistant Attorney General, for respondent.

314

ELLISON, P. J.—Appellant was convicted in the circuit court of Jackson County of forcible rape upon Edythe Irene Soma, a girl 18 years old, in violation of Sec. 4393.[1] .The jury assessed his punishment at five years imprisonment in the penitentiary. He has filed no brief and we look to his motion for new trial in the circuit court for assignments of error on all matters of exception, as required by Sec. 4150.

We find no error in the record proper. The information is in a form approved in State v. Holman, 230 Mo. 653, 132 S. W. 695, that case being followed in State v. Lindsey (Mo. Div. 2), 80 S. W. (2d) 123, 125(1). The verdict is in the usual form. His motion for new trial had been heard and overruled before judgment and sentence were pronounced, and therefore allocution was not essential. Sec. 4103. But the record recites that the defendant "having nothing further to say" judgment and sentence were accordingly rendered. They are in due form. The motion for new trial contains 31 assignments of error, many of which were too indefinite to comply with the new trial statute, Sec. 4125. But we proceed with these, so far as reviewable, first stating the facts.

The prosecutrix had been employed as a domestic for about two years by a family then residing on West 70th Street in Kansas City. On the evening of Sunday, March 26, 1944, she had visited relatives; gone with friends to a dancing place out in the county; and re-

---

[1]Citations to our statutes refer to R. S. 1939 and same section numbers in Mo., R. S. A., unless otherwise indicated.

turned on a bus to Fifteenth Street and Grand Avenue shortly after midnight, where she started walking west on the north side of Fifteenth Street two blocks to Main Street to take a Country Club streetcar back home.

Three young men on the other side of the street crossed over and began following her. By about the time she reached the first crossstreet, Walnut, one of the men—a dark complexioned fellow—overtook her, walked beside her for about 20 feet and sought to engage her in conversation. When she reached the entrance to the alley extending north between Walnut and Main Streets, she felt a pair of hands in dark gloves go over her nose and mouth, and her purse was snatched. The appellant held her hands and dragged her into the alley for about 35 feet to a place where an unpaved offset, resulting from the unequal length of two abutting buildings, made a "little alcove." Photographs of the alley entrance and the spot just mentioned were introduced, and she identified the place shown in them.

She was shoved to the ground and the appellant had forcible sexual intercourse with her, the other man—a light complexioned fellow—pressing his hands over her mouth. She struggled and tried to scream, but as soon as the appellant got up he and the other fellow exchanged positions, the appellant holding his hands over her mouth and striking her in the jaw when she attempted to scream, while the other man raped her. She could see the faces of both rapists even in a recumbent position. They took her shoes off when she kicked, and threw sand in her mouth. The appellant started to rape her a second time, but on a warning from his accomplice they fled from the alley the same way they had come in.

The prosecutrix immediately went on west to a hamburger stand at Fifteenth and Main Streets, and a man there called the police, who came in an automobile. They first took her to the scene of the crime and then drove her to the General Hospital for examination. She said she described her assailant, the appellant, to the police that night and the next day at the hospital, as having black wavy hair, height about 5 feet 7 inches and weight about 145 pounds, wearing a dark coat and trousers. His eyes had a funny cast to them. Three days later at a show-up at Police Headquarters she identified the appellant out of eight men in line. And at the trial she was positive of the identification.

She was searchingly cross-examined about the description of her assailants which she had given the police; whether the officers had prompted her when she made the identification at police headquarters (which she denied); about her movements when appellant accosted her; about the assaults; and about her ability to see the three men in the dark. On this last point she said there was a street light on the opposite side of Fifteenth Street east of the alley entrance; and that

the street or building lights further west on Main Street illuminated the alley sufficiently for her to see the two rapists. She denied remembering that she said at the preliminary hearing she only got a glance of the appellant before she had reached the alley, and didn't get a look at any of the three men until after she had started up the alley. One of appellant's attorneys testified she stated at the preliminary that the first time she saw appellant's face was when he "grabbed" her at the alley entrance. She admitted she had been raped in Omaha about 2½ years earlier when she lived there, but made no complaint because she was frightened.

In corroboration of the prosecutrix the State produced as a witness Detective Kennedy, who had taken a photograph of the part of the alley involved. It showed there was an open parking lot between Main Street and the west side of the alley, with only a picket fence 3.5 feet high separating the two for some distance south of the buildings that formed the "alcove". The alley was lower than the parking lot at that place. The purpose of the photograph was to show the lights on Main Street would illumine the alley at night. Appellant's counsel contended they would not for one lying down, because of the shadows and the difference in elevation of the terrain.

Fred Smith, who worked at the hamburger stand, testified a girl came there that Sunday night a little before or after 2 A. M. The witness was not asked to identify the prosecutrix as the girl. She was ruffled up, dirty, and her coat had trash and weeds on it. Her hair was disheveled, and she was shaky, nervous and crying. She told the witness she had been attacked. He caused the police to be called, and they came.

Witness Hauser, a patrolman, was one of the officers who answered that call. He testified the time was 12:30 A. M. The prosecutrix was very hysterical, her clothes were dirty, there was sand on her coat and the back of her hair, her face looked scratched and she had a lump on her jaw. They went to the offset in the alley and found evidence of a struggle there. The witness identified the spot from photographs in evidence. The prosecutrix was taken to General Hospital and examined by physicians. The officer said the lights on Main Street included neon signs on buildings and two street lights, which latter were about ten feet higher than the picket fence along the west side of the alley. That night they illumined the alley enough for him to see conditions on the ground. But he said he had a flash light and used it to "see better".

Officer Ila Miller arrested appellant and two other men a day or two later between Seventh Street and Baltimore Avenue, from a description that had been given him by the prosecutrix. All three of the accused denied guilt, but were taken to Police Headquarters and two of them identified by the prosecutrix in a show-up with six or seven other fellows.

Dr. Quirin of the General Hospital who had examined the prosecutrix that night about 1:30 A. M. testified he found microscopic evidences of human sperma in her posterior vagina, indicating sexual intercourse within three days. She was very nervous, close to hysteria. There were bumps on her head, the back of her skull and over the right jaw; and scratches on her legs. Sand was found in her nose, mouth and the external canal of the ears. The doctor's report showed the prosecutrix stated she had been attacked by three men down town, but he thought he remembered she said only two of them raped her.

Appellant's defense was an alibi. He testified on direct examination that he had come to Kansas City with a friend named Arnold just ten days before the alleged rape. He said he was in his rooming house at 1812 Baltimore Avenue, with Arnold and a man named Bill Johnson (called "Blackie") from 10 P. M. on, the night of the rape. Neither Arnold nor Blackie testified at the trial. One of appellant's lawyers testified a subpoena for Arnold and Blackie had been issued and a search made for them, but that they were not available as witnesses because Arnold had gone back to Oklahoma and Blackie could not be found. No effort was made to show appellant did not answer the physical description that the prosecutrix had given the police and on the stand. He said he had been blind in the right eye since he was six years old. Further he testified that when he was in the show-up he saw a police officer talking to the prosecutrix and she laughed.

Appellant had been convicted four times and sentenced to an Oklahoma prison called Grant Reformatory, and had been convicted and sentenced three times to the Oklahoma Training School. All these were for criminal offense, except that one was for violating a parole from a previous conviction. His earliest offense was committed in 1935 when he was 15 years old; his latest was in 1941, when he was 20 years old. He had been discharged from that sentence on June 16, 1943, about nine months before coming to Kansas City. The various crimes of which he had been convicted were: attempting to break into a drug store; grand larceny, twice; larceny from the person; and assault with a deadly weapon. Most of this testimony was developed on cross-examination.

William Costello, one of appellant's counsel, testified that recently before the trial he and his co-counsel, Mr. Drummond, had performed experiments in the alley involved, in the nighttime about 11 P. M., by sitting down or bending their heads to nearly a recumbent level. Their purpose was to ascertain the visibility and whether one lying on the ground in the "alcove" could distinguish the features of a man close to him. He found he could not. He said the alley was 3 to 5 feet lower than the abutting parking lot; and that this together

with the picket fence shut off at ground level the light which came from Main Street 160 feet away.

We may say at once that there is no merit in the various assignments in the motion for new trial charging in one way or another that the evidence was insufficient, and that the verdict was the result of passion and prejudice. While it is held that in a forcible rape case where the prosecutrix is a mature woman and the State's evidence is weak, there should be corroboration, State v. Thomas, 351 Mo. 804, 818(6), 174 S. W. (2d) 337, 345(13); we do not regard the State's evidence here as weak. And if corroboration was necessary, it is abundant: the victim's complaint at the first opportunity; her physical appearance showing the use of force; her mental distress; the material evidence that she had lain on the ground where there was sand, there being also sand in the alley; and the testimony of the physician who examined her genital organs. State v. Scott, 172 Mo. 536, 541, 72 S. W. 897, 898.

Going to the specific assignments of error, there are five that cannot be considered because the appellant made no objection whatever at the trial to the matters referred to. (See many cases cited in 9 West's Mo. Dig., sec. 1036, p. 582.) One complains because the State was permitted to indorse on the information the name of Detective Kelley as a witness, and to use him as such. See State v. Lindsey, supra, 80 S. W. (2d) 123, 126(11). Another assignment charges that in objecting to Mr. Costello's testimony about the tests of visibility he had made in the alley, the prosecuting attorney prejudicially characterized them as "so-called" tests. The remaining three assignments deal with the argument of State's counsel to the jury.

We shall mention specifically only one of these. It charges that in the State's closing argument prejudicial references were made to appellant's criminal record. Now in addition to the fact that no objection was made, we find that Mr. Vanice in his opening argument made no reference to that matter; that the subject was introduced by appellant's counsel, who argued the police were trying to "stick" appellant as a likely victim because he had that record; and that Mr. Hodges in closing for the State merely answered that argument.

The next specific assignment predicates error on the admission of that part of the testimony of patrolman Hauser where he was shown a photograph of the alley, and asked, "what is it?" and he answered that it showed the place where the prosecutrix "stated this act had occurred." Appellant moved to strike out the answer as hearsay, and complains of the overruling of that motion. It is the established rule that while evidence of complaint by the ravished woman at the first opportunity is competent, yet the details of her complaint would be hearsay and cannot be shown (see many cases cited, 25 West's Mo. Dig., sec. 48(2), p. 20). Just what are "details", is a question

on which all the decisions do not agree, 44 Am. Jur., sec. 84, p. 954. But the weight of authority seems to hold the complaint, as proven, should not include any statement of the place where the assault was committed. 52 C. J., sec. 91, p. 1067.

However, in this case we cannot say the error was prejudicial. As a matter of fact, in view of the promptness of the complaint and the distraught condition of the prosecutrix, it might not be going too far to say the evidence was admissible as a part of the res gestae. 44 Am. Jur., sec. 85, p. 955; 52 C. J., sec. 88, p. 1063. But aside from that, the prosecutrix had already testified without objection that when the police car arrived at the hamburger stand she "got in the car and took them over to the place where it had happened"—the alley. And earlier in his testimony Hauser, who was one of these officers, had testified that after they talked to the prosecutrix a few minutes they went to the alley with her and made an inspection. The whole case was built around the alley as the place of the assault, based on information coming from her; both sides had taken photographs of it; and appellant's defense was simply an alibi. We overrule the assignment.

Further error is assigned on the testimony of police officer Ila Miller, who arrested the appellant and two other men. He was asked by the prosecutor if he knew of his own knowledge who gave the police the first description of these "two" men. (It seems one of the three was not held.) The court overruled appellant's objection that an affirmative answer to the question would be hearsay. But the witness did not answer the question as asked. Instead, he replied: "We got the description from the victim." There was no objection to this answer, no motion to strike it out, and no exception was saved to the overruling of the objection previously made.

But beyond that, the prosecutrix had previously been permitted to testify at some length on her direct examination, without objection, that she gave the police a description of the two men the night of the rape when "they picked me up" and again the next day at the hospital; and as to what that description was. She was vigorously cross-examined on the details of the description, for the obvious purpose of trying to impeach her—as the defense later attempted to do by showing their experiments had demonstrated the darkness in the alley would have made it impossible for her to see the men.

Appellant's counsel evidently chose this method of breaking down the prosecutrix' credibility, as they had a right to do. But it cannot be said now that their failure to object when she was on the stand was a mere lapse; or that the State's theory then was undeveloped; or that they should have been allowed to change tactics and interpose objections to the same kind of testimony later on, as was done in different circumstances in State ex rel. Highway Comm. v. Young, 324

Mo. 277, 286-7(2), 23 S. W. (2d) 130, 133(5, 6). See authorities on this point cited in the margin.[2]

█ Further error is assigned on the detailed cross-examination of the appellant concerning his arrest and incarceration in Oklahoma on the various criminal charges heretofore detailed in this opinion. This subject was first injected into the case in appellant's direct examination, when the fact was elicited from him that he had been discharged from the Oklahoma penitentiary on June 16, 1943, about nine months before he came to Kansas City. The rest was brought out on cross-examination. When appellant was asked *where* he was convicted of grand larceny and his counsel objected, the objection was sustained. He made the same objection to another similar question, and the question was changed and answered without further objection. These were the only objections made to this line of examination. There is no record basis for appellant's assignment here.

█ Error is assigned in the giving of [306] the State's instruction 5 on the credibility of witnesses. The complaint is not directed to the part given, but to the omission of the last paragraph from the instruction as originally drawn. Appellant's brief says that part told the jury if they "believed any witness had wilfully sworn falsely to any material fact they were at liberty to disregard any or all of his testimony." Instructions containing that language were criticized in State v. Willard, 346 Mo. 773, 781(6), 142 S. W. (2d) 1046, 1052 (15, 16). And while no cases have yet been reversed because of them, it certainly can be affirmed that their refusal is not error. State v. Breeden (Mo. Div. 2), 180 S. W. (2d) 684, 686(2).

█ The State's instruction No. 4 is assailed because it failed to define reasonable doubt. We are unable to see that it did. It stated: "a doubt to authorize an acquittal on that ground ought to be a substantial doubt touching defendant's guilt and not a mere possibility of defendant's innocence." The words have been so defined in this State for years. 36 Words & Phrases (Perm. Ed.) pp. 323-325.

█ Appellant contends the State's instruction No. 6 on alibi was erroneous because it cast on him the burden of proving beyond a reasonable doubt that he was not present at the time and place of the alleged rape. The instruction was as follows:

"The Court instructs the jury that if there is any evidence before you that raises in your minds a reasonable doubt as to the presence of the defendant at the time and place where the crime is charged to have been committed (if you find a crime was committed), you will acquit the defendant."

---

[2]Bennette v. Hader, 337 Mo. 977, 983, 87 S. W. (2d) 413, 416(6); 53 Am. Jur. sec. 143, p. 128 (text to marginal notes 6, 7); sec. 144, p. 129 (text to marginal note 7); 64 C. J. sec. 192, p. 171.

The instruction was approved in State v. Berkowitz, 325 Mo. 519, 530, 29 S. W. (2d) 150, 155 (15) and several other decisions cited in 3 Raymond, Missouri Instructions (Perm. Ed.), sec. 3373, p. 79. It passed muster in the Berkowitz case as against the only contention that could be made against it, namely that it conversely implies there must be *some* "evidence before you" (the jury) tending to establish an alibi, which implication in turn may appear to suggest the defendant must produce that evidence. But it clearly does not cast on the defendant the burden of proving the alibi *beyond* a reasonable doubt —which is the assignment made here. On the contrary, even at worst, it only says all the defendant need do is to produce evidence *raising* a reasonable doubt.

We agree with what is said on this question in the well reasoned opinion of Barrett, C., in State v. Hubbard, 351 Mo. 143, 151-4, 171 S. W. (2d) 701, 707 (11-13). There is nothing mysterious or special about an alibi defense. It is simply a method of proving circumstantially that the accused didn't commit the crime because he wasn't there and consequently couldn't have perpetrated it—except, sometimes, in conspiracy or accomplice cases where the defendant could have been particeps criminis without being present. Logically, there is no difference between an alibi defense and one which admits the presence of the accused at the time and place of the crime but seeks to establish his innocence by showing he couldn't have committed it for some other reason—or just that he didn't do the criminal act. In our opinion, the four line instruction on alibi quoted in the Hubbard case from State v. Sanders, 106 Mo. 188, 195-6, 17 S. W. 223, 224(5) is sufficient.

We find no error in the record and the judgment and sentence are affirmed. All concur.