STATE of Tennessee, Appellant,

v.

Cornelius KENDRICKS, Appellee.

Supreme Court of Tennessee, at Knoxville.

Dec. 5, 1994.

Charles W. Burson, Atty. Gen. & Reporter, John B. Nisbet, III, Asst. Atty. Gen., Nashville, for appellant.

William B. Mitchell Carter, Carter, Mabee, Paris & Fields, Chattanooga, for appellee.

BIRCH, Justice.

The Criminal Court of Hamilton County entered judgment convicting Cornelius Kendricks, the defendant, of aggravated rape[1] and aggravated kidnapping.[2] Finding that certain of the victim's statements had been erroneously admitted into evidence as "fresh complaints," the Court of Criminal Appeals reversed the convictions. We granted the State's application for review pursuant to Tenn.R.App.P. 11 to determine whether the intermediate court correctly applied the doctrine of "fresh complaint" and to examine

1. Tenn.Code Ann. § 39–2–603 (Supp.1988).

2. Tenn.Code Ann. § 39–2–301 (Supp.1988).

and clarify that doctrine as it applies in cases where an adult is the victim of a sexual crime.

The judgment of the Court of Criminal Appeals is affirmed as modified.

## I

The record establishes that Brenda Derrick worked for a produce company in Chattanooga. As she was walking to work at approximately 9:30 p.m., June 15, 1989, the defendant, a man she later identified as Cornelius Kendricks, pulled up beside her in his truck and offered her a ride. Although she had not been previously acquainted with him, she accepted his offer and climbed into the truck.

Pretending that his destination was the home of a friend, the defendant drove instead to a remote industrial area. When the defendant stopped the truck, Derrick jumped out in an effort to escape. He caught up with her and forced her, at gunpoint, back into the truck. While still wielding the gun, the defendant ordered her to perform oral sex; Derrick complied.

After this, the defendant drove a short distance to a residential neighborhood, threw Derrick from the truck, and drove away. Derrick ran to a nearby house and asked Lula Jones, who responded to her knock, to use the bathroom. When Derrick returned from the bathroom, she told her that she had been raped. She asked Jones to call the police; she did so immediately.

Officer Marcus Easley of the Chattanooga Police Department responded to the call. Derrick told Easley what had happened; he incorporated her story into a standard incident report prepared at 10:47 p.m. Easley then drove Derrick back to the scene where Detective Larry Swafford awaited them. Swafford talked with Derrick and recorded her statement at 11:12 p.m. In that statement, Derrick related that she had been picked up by a man in a white truck whom she had seen many times before. She said also that the man had drawn a gun on her,

ripped her blouse and bra, and forced her to perform oral sex.

Approximately six months later, Derrick espied Kendricks next to his truck at a local gasoline station. She noted the license tag number and gave it to the police. Kendricks was subsequently apprehended and charged pursuant to Derrick's accusations.

## II

The controversy in this case concerns the admissibility of two statements made by Derrick to investigating officers shortly after the incident.[3] The first statement introduced was given to Swafford and was recorded on tape. The statement, given some forty minutes or so after the incident, was in question-answer form—Swafford's questions and Derrick's answers. When the statement was admitted into evidence, Derrick had not testified. The defendant objected to the admission of the statement on hearsay grounds. The trial court, explaining that the statement constituted a "fresh complaint," permitted the jury to listen to the tape and allowed a written copy to be provided to each juror. Additionally, the trial court instructed the jurors that the statement had been admitted "to corroborate Derrick's testimony."

The second statement was introduced as follows: At the conclusion of Kendricks' proof, the State called Easley as a rebuttal witness. He identified the incident report he prepared at Jones' house. Upon the State's motion, the trial court admitted the incident report into evidence "as a 'fresh complaint' to counter the defendant's efforts to impeach Derrick."

Kendricks testified in his own behalf. He acknowledged that the act of fellatio occurred as Derrick described it, but he insisted that Derrick had agreed to perform the sexual act for money—an act of prostitution, in other words. He stated that Derrick became irate when he refused to pay her the amount initially agreed upon.

As stated, the jury convicted Kendricks of aggravated kidnapping and aggravated rape, and the trial court approved the verdict.

---

**3.** Derrick's statement to Jones is not at issue inasmuch as it was presented by the defendant during his case-in-chief to attack the victim's credibility.

Kendricks appealed of right to the Court of Criminal Appeals. Among the issues he raised was whether the trial court erred in admitting the tape recorded statement and the incident report under the "fresh complaint" doctrine. The Court of Criminal Appeals considered these two contentions, *inter alia,* and reversed the convictions based upon its analysis of the "fresh complaint" doctrine.

In its analysis, the court acknowledged that Tennessee law permits a complaint made by a rape victim to a third person soon after the incident to be admitted as evidence-in-chief for the purpose of corroborating the victim's trial testimony. The court also cited cases holding that a delayed complaint may be admitted as long as the delay is reasonably explained. After synthesizing the case law regarding the "fresh complaint" doctrine, the court determined that a "totality of circumstances" test had evolved for assessing the reasonableness of the delay in making the complaint. Included in this test, the court wrote, are factors such as (1) the age and mental capacity of the victim, (2) the nature and strength of any threats made toward the victim by the perpetrator, and (3) the spontaneity of the complaint.

Both the incident report and the tape recorded statement were taken within an hour of the incident. At first glance, both statements would appear to meet the traditional requirements for admissibility under the "fresh complaint" doctrine. Nevertheless, the court held that the trial court had committed reversible error by admitting the statements. The court explained:

> [T]he information elicited by Officer Easley does not [qualify as "fresh complaint" evidence]. Neither does the taped interview by Detective Swafford or its transcription. The victim's statements were not spontaneously made. Through the investigative process, the victim was asked to reflect upon the encounter, recall its details, and make a statement for the record. Although the complaint was "fresh" in that the delay between the incident and

the victim's statement to the police was relatively short, it is our view that its lack of spontaneity disqualifies the evidence.

The State of Tennessee applied for permission to appeal. As stated previously, we granted that application in order to review that decision and to clarify the "fresh complaint" doctrine in Tennessee as it applies to adult victims.

## III

■ A threshold issue that we must determine preliminarily is whether the doctrine of "fresh complaint" has survived the adoption of the Tennessee Rules of Evidence. Although "fresh complaint" is not expressly addressed in the Rules, Rule 101 states that the "rules shall govern evidence rulings in all trial courts of Tennessee except as otherwise provided by statute or rules of the Supreme Court of Tennessee." Rule 402 provides that "relevant evidence is admissible. . . ." We find that evidence which corroborates a victim's testimony does tend to make the existence of a consequential fact "more probable" within the meaning of Rule 401 and is therefore relevant and admissible under Rule 402. Under the circumstances, we hold, therefore, that the doctrine of "fresh complaint," as herein modified, has indeed survived the adoption of the Tennessee Rules of Evidence.

Fresh complaint evidence is highly unusual in the sense that such evidence is neither purely substantive nor purely rehabilitative. Actually, it exhibits characteristics of both.[4] Because this class of evidence does not fit neatly into the familiar categories of evidence law, it will facilitate our discussion to briefly trace its evolution from common law origins.

The "fresh complaint" doctrine in rape cases has ancient origins. The doctrine evolved from the early common-law requirement of "hue and cry," whereby female victims of violent crimes were expected to cry out immediately after the commission of the crime to alert their neighbors that they had been assaulted. The original purpose of this requirement was to facilitate the capture of

---

4. The Maryland *Court of Appeals* colorfully characterized the "fresh complaint" doctrine as an "evidentiary amphibian, possessing both lungs and gills. It is neither purely aquatic rebuttal evidence nor yet solidly land-based substantive evidence." *Cole v. State,* 83 Md.App. 279, 574 A.2d 326, 330–31 (1990).

the wrongdoer. 2 F. Pollock & F. Maitland, *The History of the English Law Before the Time of Edward I* 578–79 (2d ed. 1923); *State v. Hill*, 121 N.J. 150, 578 A.2d 370, 374 (1990). A consequence of "hue and cry" was that should the victim fail to cry out, the assumption was that she had been somehow implicated, and the state was not allowed to prosecute the wrongdoer.[5] Pollock & Maitland, 578–79; *Hill*, 578 A.2d at 374. However, the "hue and cry" requirement was limited to rape cases, and only those females who had complained immediately were eligible to have their cases prosecuted. Because it proved ineffective as a means of facilitating the capture of perpetrators, the literal "hue and cry" requirement obsolesced, so that women who did not immediately complain were no longer categorically prohibited from prosecuting their cases. 1 L. Radzinowicz, *A History of English Criminal Law* 27 (1956).

The courts continued, however, to assume in these cases that any "normal" woman would report a rape soon after its occurrence. The clear implication of this assumption was that if the woman did not complain, it was likely that no rape had occurred. *See* Dawn M. DuBois, *A Matter of Time: Evidence of a Victim's Prompt Complaint in New York*, 53 Brooklyn L.Rev. 1087 (1988). Therefore, these courts allowed evidence of the woman's silence to be introduced as a self-contradiction to her later claim of rape. *Hill*, 578 A.2d at 375; *Cole*, 574 A.2d at 331. These assumptions about how a "normal" woman should react to a sexual assault, coupled with the common-law rule requiring corroboration of the victim's testimony in order to obtain a rape conviction,[6] reflect the common law's profound distrust of female complainants in rape cases. *See* S. Estrich, *Rape*, 95 Yale L.J. 1087 (1986).

Because juries were allowed—sometimes even instructed—to draw negative inferences from the woman's failure to complain after an assault, *see e.g., State v. Thomas*, 351 Mo. 804, 174 S.W.2d 337, 345 (1943), the doctrine of "fresh complaint" evolved as a means of counterbalancing these negative inferences. Used in this way, the "fresh complaint" doctrine allowed the prosecutor to introduce, during the case-in-chief, evidence that the victim had complained soon after the rape. Its use thereby forestalled the inference that the victim's silence was inconsistent with her present formal complaint of rape. 4 J. Wigmore, *Evidence* § 1135 (Chadbourn rev. ed. 1972). In other words, evidence admitted under this doctrine effectively served as "anticipatory rebuttal," in that the doctrine often permitted the prosecutor to bolster the credibility of the victim before her credibility had first been attacked. *Id.* The "fresh complaint" doctrine thus constituted a rare exception to the common-law rule that prohibited rehabilitative evidence in the absence of an attack on the witness's credibility. *Id.; see also*, Wigmore, § 1124; 1 *McCormick on Evidence* § 47 (4th ed. 1992).

Despite its explicitly sexist genesis, the "fresh complaint" doctrine is viable and in use today in a large majority of American jurisdictions. *See Aaron v. State*, 273 Ala. 337, 139 So.2d 309 (1961); *Greenway v. State*, 626 P.2d 1060 (Alaska 1980); *Bing v. State*, 23 Ark.App. 19, 740 S.W.2d 156 (1987); *People v. Meacham*, 152 Cal.App.3d 142, 199 Cal.Rptr. 586 (1984); *People v. Montague*, 181 Colo. 143, 508 P.2d 388 (1973); *Fitzgerald v. United States*, 443 A.2d 1295 (D.C. 1982); *Custer v. State*, 159 Fla. 574, 34 So.2d 100 (1947); *Epps v. State*, 216 Ga. 606, 118 S.E.2d 574 (1961); *State v. Hall*, 88 Idaho 117, 397 P.2d 261 (1964); *People v. Robinson*, 73 Ill.2d 192, 22 Ill.Dec. 688, 383 N.E.2d 164

---

5. The early "hue and cry" requirement was extremely stringent. For example, in 1250 Bracton wrote that

> When therefore a virgin has been so ... overpowered, against the peace of the lord the king, forthwith and while the act is so fresh she ought to repair with hue and cry to the neighboring vills and there display to honest men the injury done to her, the blood and her dress stained with blood, and the tearing of her dress; and so she ought to go to the provost of

the hundred and to the serjeant of the lord the king and to the coroners and to the viscount and make her appeal at the first county court. H. Bracton, *De Legibus Angliae*, f. 147 (quoted in 6 Wigmore, *Evidence* § 1760 (Chadbourn rev. ed. 1976)).

6. On the corroboration requirement, *see* W. Nelson, *Criminality and Sexual Morality in New York, 1920–1980*, 5 Yale J. of Law & Humanities 265, 302 (1993).

(1978); *Woods v. State,* 233 Ind. 320, 119 N.E.2d 558 (1954); *State v. Grady,* 183 N.W.2d 707 (Iowa 1971); *Cook v. Commonwealth,* 351 S.W.2d 187 (Ky.Ct.App.1961); *Commonwealth v. Lavalley,* 410 Mass. 641, 574 N.E.2d 1000 (1991); *State v. Calor,* 585 A.2d 1385 (Me.1991); *Cole v. State,* 83 Md. App. 279, 574 A.2d 326 (1990); *People v. Lawson,* 34 Mich.App. 620, 192 N.W.2d 60 (1971); *Carr v. State,* 208 So.2d 886 (Miss. 1968); *State v. Van Doren,* 657 S.W.2d 708 (Mo.Ct.App.1983); *State v. Daniels,* 222 Neb. 850, 388 N.W.2d 446 (1986); *State v. Bethune,* 121 N.J. 137, 578 A.2d 364 (1990); *State v. Baca,* 56 N.M. 236, 242 P.2d 1002 (1952); *People v. Stripling,* 162 A.D.2d 1029, 557 N.Y.S.2d 226 (1990); *State v. Campbell,* 299 Or. 633, 705 P.2d 694 (1985); *Commonwealth v. Green,* 487 Pa. 322, 409 A.2d 371 (1979); *State v. Harrison,* 236 S.C. 246, 113 S.E.2d 783 (1960); *State v. Twyford,* 85 S.D. 522, 186 N.W.2d 545 (1971); *Vera v. State,* 709 S.W.2d 681 (Tex.Ct.App.1986); *Moore v. Commonwealth,* 222 Va. 72, 278 S.E.2d 822 (1981); *State v. Ferguson,* 100 Wash.2d 131, 667 P.2d 68 (1983); *State v. Golden,* 175 W.Va. 551, 336 S.E.2d 198 (1985).

Nevertheless, the test for determining the admissibility of "fresh complaint" evidence has been anything but uniform. Rather, as Wigmore explains in his treatise, the courts have utilized three distinct analytical modes to make this determination. Wigmore, §§ 1134–40.

The first mode of "fresh complaint" analysis may be characterized as the "pure" version. Because the objective of the "pure" approach is simply to rebut the negative inference thought to be drawn from the victim's silence, this view allows only the *fact* of the complaint—if the complaint was made within a reasonable time after the rape—to be admitted in the state's case-in-chief. This view does not permit the witness to relate the *details* of the complaint. Wigmore, §§ 1135, 1136.

The second mode of analysis uses the principles governing the admission of prior consistent statements. This view is similar to the "pure" version in that the fact of the complaint is admissible in the state's case-in-chief to rebut the potential negative infer-

ence created by the victim's silence. However, this view also provides that once the credibility of the victim has been assailed, the *details* of the complaint are admissible to show that the victim related the same story soon after the incident. Both the "pure" and the "prior consistent statement" modes of "fresh complaint" usage are solely corroborative: the first is corroborative of the fact that the victim lodged a formal complaint of rape; the second is corroborative of the victim's specific testimony regarding the incident. Therefore, under these two approaches it is necessary that the victim actually testify at trial. Moreover, because the "fresh complaint" testimony under each of these two modes is admitted for corroborative purposes only, the hearsay rule is inapplicable. Wigmore, §§ 1137, 1138.

The third mode of "fresh complaint" analysis is accomplished under the principles governing the excited utterance exception to the hearsay rule. Under this view, a complaint made soon after the incident may be admitted in the state's case-in-chief as substantive evidence if it satisfies two general requirements: (1) that the statement was made in relation to a startling event or condition, and (2) that the statement was made while the declarant was under the excitement or stress caused by the event. Wigmore, § 1139. *See* Tenn.R.Evid. 803(2) (requirements for an excited utterance).

■ Tennessee does not subscribe to any of the analytical modes outlined in the Wigmore treatise. Rather, in *Phillips v. State,* 28 Tenn. (1 Hum.) 246 (1848), this Court enunciated a position on "fresh complaint" which allows both *the fact and the details* of the complaint to be admitted during the state's case-in-chief. The *only* limitation on the admissibility of this evidence is that the complaint must have been made within a reasonable time after the rape. Although the *Phillips* Court realized that its view was a departure from the traditional notion that rebuttal or rehabilitative evidence is not admissible until the victim's credibility has been impeached, the Court deemed the departure justifiable in light of the unique nature of the crime of rape. The Court, quoting from a treatise on evidence, reasoned as follows:

The fact that the prosecutrix made complaint recently after the commission of the alleged crime seems to be considered as admissible generally. It is a test applicable to the accuracy as well as to the veracity of the witness, and, therefore, it seems that her account of the transaction, if communicated recently, is admissible. *In principle such evidence is not in general admissible until the testimony of the witness has been in some degree impeached by an attempt to show that the statement is a fabrication. But in a case of this nature, after prima facie evidence has been given of the perpetration of the crime, the defense usually rests upon some impeachment, of either the honesty or the accuracy of the witness, and, in either case, the evidence seems to be admissible on the strictest principles.*

*Id.* (emphasis added). The rationale of the *Phillips* Court was based upon its view that an attack on the victim's credibility was inevitable in every case. To support its view, the Court drew on two assumptions: (1) seldom are there eyewitnesses to rape, and (2) the defense is often consent. Thus, the *Phillips* Court ruled that the *fact* and *details* of the complaint could be safely admitted before the victim's credibility had been actually attacked. In so ruling, the Court deemed the fact of the complaint relevant in support of the victim's "honesty" in lodging a formal complaint; the details of the complaint were viewed as relevant to support the "accuracy" of the victim's trial testimony.

Although the *Phillips* rule has been followed for many years, it should not survive modern-day scrutiny. A very real danger lurks in prematurely admitting the details of the victim's complaint as evidence in the state's case-in-chief. The victim may be impeached on grounds other than the accuracy of his or her direct testimony. For example, if a victim were shown to have harbored a pre-complaint motive to falsely accuse the defendant of rape, the fact that the details of the victim's complaint are consistent with the in-court testimony would be irrelevant in re-

buttal of the impeachment testimony. Thus, the *Phillips* rule clearly invites the risk that the jury would be allowed to hear an irrelevant repetition of the victim's testimony that could not be subjected to prompt cross-examination. This potential for prejudice threatens the defendant's right to a fair trial as guaranteed by the Fifth and Sixth Amendments to the United States Constitution and Article I, Section 9, of the Tennessee Constitution.

This risk is unnecessary. It can be avoided by requiring courts to condition the admissibility of the details of the complaint upon the most fundamental principle governing the admissibility of a prior consistent statement—that the victim's credibility must have already been attacked before the rehabilitative evidence is admissible. This position is adhered to by the large majority of courts that permit testimony as to the details of the complaint. *See Commonwealth v. Lavalley*, 410 Mass. 641, 574 N.E.2d 1000, 1002–1003 n. 4 (1991). In fact, only two other states which allow such testimony depart from the general requirement that the victim's credibility be first challenged. *See Lavalley, supra; State v. Blohm*, 281 N.W.2d 651 (Minn.1979).

█ We must not blindly follow a rule which entails a substantial and unnecessary risk of prejudice to the defendant, especially when a clear alternative exists. Although the principle of *stare decisis* demands that decisions not be casually overruled, this Court has a duty to reject a principle of law which no longer works. *Dupuis v. Hand*, 814 S.W.2d 340, 345 (Tenn.1991); *Hanover v. Ruch*, 809 S.W.2d 893, 898 (Tenn.1991).

Accordingly, we today join the mainstream on this issue and overrule *Phillips* and its progeny to the extent that they permit testimony of the *details* of the incident to be presented before the victim's credibility is attacked. Our holding does not affect the admissibility of the *fact* of the complaint, which remains admissible in the state's case-in-chief.[7]

---

7. We realize that admitting the fact of the complaint (which can include the nature of the complaint and the identity of the wrongdoer) during

the state's case-in-chief furthers society's assumptions about how victims respond to the crime of rape. We also realize that these as-

We would certainly prefer to abolish the doctrine in its entirety, given its genesis in the profoundly sexist expectation that female victims of sexual crimes should respond in a prescribed manner or risk losing credibility. Even though psychologists have proved that victims respond to sexual attacks in no prescribed way, abolition of the doctrine would strip the victim of one of the few methods to rebut the expectation of outcry, now deeply rooted in our culture. So until the "presumption" that the victim's testimony is a fabrication disappears, we must retain the doctrine of "fresh complaint," at least as we have today modified it.

■ We turn to the case under review. We find that the admission of Easley's testimony comports with the rule of "fresh complaint" we have here adopted. Easley initially testified in the State's case-in-chief, but his testimony at that time contained no details of the complaint. Easley related that he had responded to a call from Jones and that the victim had advised him of certain matters that he included in an incident report. As a result of taking the report, he called for a major crimes detective (Swafford) because he suspected the "possibility that a sex crime had occurred." Easley also testified that Derrick appeared shaken and upset during this time. The details of the victim's complaint as reported by Easley in the incident report were first admitted on rebuttal, after the defendant had attacked the victim's credibility. At that time, the trial court instructed the jury that it was permitting consideration of the statement in the report for two purposes only: (1) to determine whether the victim was credible and (2) to determine whether the statement corroborated her earlier testimony. The admission of this evidence as thus delineated was not error.

■ As for the tape-recorded statement taken by Swafford, it was admitted as a "fresh complaint" before Derrick's credibility had been attacked. This statement included the details of the incident. Thus, under the

holding we announce today, the trial court erred in admitting the taped statement as part of the State's case-in-chief.

We must now determine whether the error in admitting this statement was harmless. We agree with the Court of Criminal Appeals in its view that although the State's case was relatively strong the error was not harmless. The essential issue was credibility. The erroneous testimony was introduced solely to bolster the victim's credibility, and we cannot say that its admission was harmless. Tenn. R.App.P. 36(b).

■ Although we reach a similar conclusion as did the Court of Criminal Appeals, we do so under a different rationale. The intermediate court concluded that Derrick's statement to Swafford failed to qualify for admission as a "fresh complaint" because it lacked "spontaneity." Tennessee's interpretation of the "fresh complaint" doctrine has never required the victim's complaint to be "spontaneous," as the Court of Criminal Appeals used that term, to be admissible. The concept of "spontaneity" in that sense may be relevant in determining the admissibility of evidence offered under the excited utterance exception to the hearsay rule, or it may be one of several factors considered to determine whether the complaint was timely, but spontaneity is not the controlling factor for admissibility. Because excited utterance evidence is used substantively, that is, to prove the truth of the matter asserted, the principles governing its admission require that the statement be made under the stress of an exciting event before the declarant has time for reflection and deliberation. *See* Tenn. R.Evid. 803(2); *National Life & Accident Ins. Co. v. Follett,* 168 Tenn. 647, 80 S.W.2d 92 (1935). Only under these circumstances is the statement thought to be sufficiently reliable to justify the defendant's lack of ability to cross-examine the declarant at trial.

By contrast, the *fact* of the complaint is admitted under the "fresh complaint" doctrine to dispel any inference that the victim's

---

sumptions have been found to be erroneous, or at the very least, only partially valid. However, we agree with the New Jersey Supreme Court's observations in *Hill, supra,* that the elimination of this component of the "fresh complaint" doc-

trine could unfairly penalize rape victims because a substantial number of jurors still feel that persons who remain silent have not actually been raped. *Hill,* 578 A.2d at 378.

silence contradicts the present complaint; it is not admitted as substantive evidence. Therefore, the "timeliness" requirement of the "fresh complaint" doctrine is not nearly as stringent as it is in the realm of the excited utterance exception to the hearsay rule. *See People v. Damen,* 28 Ill.2d 464, 193 N.E.2d 25, 29–31 (1963) (good discussion of the conceptual differences between the "fresh complaint" doctrine and the excited utterance exception); *State v. Stevens,* 289 N.W.2d 592 (Iowa 1980) (same). In fact, as Wigmore suggests, if the "fresh complaint" is used only to prove that the victim said *something* about the incident, the timing of the complaint is wholly irrelevant. Wigmore, § 1135. An extremely belated complaint would, under this view, be admissible to show that the victim complained, and the jury would be entitled to determine what weight to give a complaint made long after the incident. While Tennessee continues to require that the complaint be timely, it is useful to illustrate the contrast between the timeliness requirements of the "fresh complaint" doctrine and the excited utterance exception to the hearsay rule.

In the instant case, Derrick gave her statements to Swafford and Easley within an hour of the alleged incident. The timeliness of the complaint is still an important requirement for admissibility, but whether a complaint was timely depends upon an assessment of all the facts and circumstances. Under our prior decisions, Derrick's statements to Easley and Swafford, made within an hour of the incident, clearly qualify as timely. *Johnson v. State,* 201 Tenn. 11, 296 S.W.2d 832 (1956) (statement by victim to father less than an hour after occurrence); *see also, Carroll v. State,* 212 Tenn. 464, 370 S.W.2d 523 (1963) (statement by victim to police soon after occurrence); *King v. State,* 210 Tenn. 150, 357 S.W.2d 42 (Tenn.1962) (statement by victim to police within hours of occurrence).

As stated, the Court of Criminal Appeals found that even though the complaints in question were "fresh" in that they were made shortly after the incident, they lacked "spontaneity." This lack of spontaneity, the court continued, disqualified the statements for admission as "fresh complaints."

■ "Spontaneity," as used in this context, suggests an element based upon time. It suggests, also, an element based upon whether the statement was solicited. Having addressed the time element, we now address the fact that the statements were produced through a question-answer procedure.

Although the Court of Criminal Appeals in *Myers v. State,* 764 S.W.2d 214 (Tenn.Crim. App.1988), implied that a statement made to an investigating officer might be inadmissible as "fresh complaint" evidence, the sounder view is that statements given in response to questioning by law enforcement officers are not automatically disqualified for admission as "fresh complaint" evidence. Rather, the nature, type, and purpose of the questioning should be considered by the trial court to determine if the statements actually constitute a legitimate "complaint." *See People v. Harris,* 134 Ill.App.3d 705, 89 Ill.Dec. 446, 480 N.E.2d 1189 (1985); *State v. Hill,* 121 N.J. 150, 578 A.2d 370, 378–80 (1990); *State v. Bethune,* 121 N.J. 137, 578 A.2d 364, 367–68 (1990). If the questioning is neither coercive nor suggestive, the statements may be safely admitted. If the questioning is clearly leading or overly suggestive, however, the resulting statement would not, in all likelihood, be the victim's product. Rather, it would be the questioner's product. In such case, the statement should, obviously, be excluded.

■ In the case under submission, Derrick's statements were given in response to general non-coercive questioning by Easley and Swafford. Moreover, the record contains no indication that either Easley or Swafford had any information about the incident prior to questioning Derrick. Therefore, it is highly unlikely that either of them could have influenced Derrick's statements in any way. Thus, the fact that the statements constituted answers to questions asked by Easley and Swafford should not deprive them, under the circumstances, of their character as "fresh complaints."

## IV

In summary, the judgment of the Court of Criminal Appeals reversing the case and re-

manding it for a new trial is affirmed. The case shall be retried pursuant to principles consistent with this opinion. Inasmuch as the requirements for the admission of "fresh complaint" evidence in cases with a child victim may be different, as stated earlier, we restrict this holding to cases involving adult victims of sexual crimes. In such cases, we hold that under the doctrine of "fresh complaint," the fact a complaint was made is admissible in the state's case-in-chief to rebut the possible negative inference created by the victim's silence. Once the credibility of the victim has been attacked, the details of the complaint are admissible to show that the victim related the same story soon after the incident.

Whether a statement is a "fresh complaint" is a determination to be made on a case by case basis. We note, however, that since "fresh complaint" testimony is admissible only as corroborative evidence, there are no strict time requirements for admissibility. Thus, while the complaint must be timely, it need not be contemporaneous with the underlying event. Further, a statement can be a "fresh complaint" even if made in response to questions by law enforcement officers provided the questioning was general and neither coercive nor suggestive.

To the extent that *Phillips* and its progeny are inconsistent with this holding, they are overruled. This holding applies to all cases tried after the release of this opinion and to those wherein a motion for new trial was granted on or after the date of the release of this opinion.

ANDERSON, C.J., DROWOTA, J., and CHARLES H. O'BRIEN, Special Justice, concur.

REID, J., concurs separately.

REID, Justice, concurring.

I concur in the Court's decision, and write separately only because, in my opinion, the Court should set forth some standards for determining the timeliness of an admissible fresh complaint.

The Court has adopted a new rule because, under prior law, as stated by the Court, the "potential for prejudice threatens the defen-

dant's right to a fair trial as guaranteed by the Fifth and Sixth Amendments to the United States Constitution and Article I, Section 9 of the Tennessee Constitution." *Supra* at 603. The rule governing the admissibility of evidence of a prior complaint announced in this decision is much stricter than prior law. The alleged victim's prior statements, regardless of how "fresh" they may be, are not admissible for any purpose other than corroboration of the victim's testimony, they are not admissible for the purpose of corroboration unless the victim's credibility as a witness has been attacked, and they are not admissible even for that limited purpose unless the Court finds that, under all the relevant circumstances, the statement was made timely. If the form and circumstances of the victim's prior complaint ensures its reliability, and the complaint tends to strengthen or confirm the victim's in court testimony, which has been subjected to impeachment, the prior complaint is admissible in support of the victim's credibility.

The Court does not, as I understand the opinion, reject the premise that, as the time between the crime and the complaint lengthens, the opportunity for invention or distortion through mistake, fading memory, fantasizing, or contrivance grows. *Commonwealth v. Dion*, 30 Mass.App.Ct. 406, 568 N.E.2d 1172, 1176 (1991). Nor does the Court reject the traditional criteria for determining if a prior complaint was timely made, that is, was in fact a fresh complaint.

The passage of time has always been an important consideration. Consequently, a delay without a reasonable explanation would cause the complaint to be suspect. The Court points out that a complaint, to be timely, need not be spontaneous; however, the Court does not find spontaneity irrelevant. Obviously spontaneity may be in some cases the surest indicator of reliability. The Court in this case found that the victim's response to general, non-coercive questions asked by police officers within an hour was timely.

Other factors which may be relevant to the determination of timeliness include the age and maturity of the victim, the use of threats

or other means of intimidation by the offender, the victim's opportunity and capacity to complain, the relationship between the victim and the offender, and the victim's purpose in making the complaint.

These relevant circumstances, and perhaps others, determine the *reliability* of the prior consistent statements, which is the essential test of timeliness and therefore admissibility.