IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
November 7, 2017 Session

## STATE OF TENNESSEE v. MICHAEL EDWARD ROBERTS

**Appeal from the Circuit Court for Obion County**
**No. CC-16-CR-125     Jeffrey W. Parham, Judge**

_____

### No. W2017-00395-CCA-R3-CD

_____

The Defendant, Michael Edward Roberts, was indicted on one count of aggravated burglary, a Class C felony; one count of aggravated kidnapping, a Class B felony; seven counts of rape, a Class B felony; and one count of aggravated assault, a Class C felony. See Tenn. Code Ann. §§ 39-13-102, -13-304, -13-503, -14-403. The State ultimately dismissed five of the rape charges. Following a bench trial, the trial court convicted the Defendant of aggravated assault and the lesser-included offenses of aggravated criminal trespass of a habitation, a Class A misdemeanor, and two counts of assault, a Class B misdemeanor. See Tenn. Code Ann. §§ 39-13-301(a)(3), -14-406. The trial court acquitted the Defendant of the aggravated kidnapping charge. After a sentencing hearing, the trial court imposed a total effective sentence of three years to be served on supervised probation. On appeal, the Defendant contends (1) that the evidence was insufficient to sustain his convictions and (2) that the trial court erred in admitting fresh complaint evidence. Discerning no error, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN and ROBERT L. HOLLOWAY, JR., JJ., joined.

Charles S. Kelly, Sr., Dyersburg, Tennessee, for the appellant, Michael Edward Roberts.

Herbert H. Slatery III, Attorney General and Reporter; Jonathan H. Wardle, Assistant Attorney General; Thomas A. Thomas, District Attorney General; and James T. Cannon, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

## FACTUAL BACKGROUND

The victim, E.M.,[1] testified that she and the Defendant were coworkers and had engaged in a lengthy sexual relationship. The victim testified that during the course of their relationship, the Defendant began to regularly beat her buttocks until she bled when they had sex. The victim explained that the Defendant first used his hand but later switched to using a belt. It was around this time that the victim decided to end her relationship with the Defendant. However, the victim testified that the Defendant "would not take no for an answer."

While she was attempting to end her relationship with the Defendant, the victim began a second relationship with another coworker, Mark Sering. The victim testified that the Defendant became suspicious of the victim and Mr. Sering and started "going ballistic" after seeing a picture that Mr. Sering posted on Facebook of the victim in her car. This eventually led to an altercation between Mr. Sering and the Defendant at their workplace on January 14, 2016.

The victim testified that she texted both Mr. Sering and the Defendant after their altercation to reveal that she had been seeing both of them and to end her relationship with each of them. According to the victim, she was on her way to work the next morning, January 15, 2016, when she received a phone call from the Defendant. The victim testified that the Defendant told her that if she did not turn around and go back to her trailer, "there was gonna be really big problems at work."

According to the victim, the Defendant met her at a nearby exit and followed her to her trailer. The victim testified that she agreed to the Defendant's demands. She said that she was scared of the Defendant because even though he had never "put his hands on" her, he had threatened her and Mr. Sering. The victim further testified that she planned to talk to the Defendant in her yard and to go back to work.

Once they were at the victim's trailer, the Defendant got out of his car and punched the hood of the victim's car. The victim testified that the Defendant then threatened to punch the window of her car if she did not get out. The victim believed that the Defendant was intoxicated. According to the victim, she got out of her car and the Defendant told her to go into the trailer.

The victim testified that she had not planned to let the Defendant into her trailer that morning and that she never gave the Defendant permission to enter the trailer. The victim further testified that after she got out of her car, the Defendant "had [her] by the

---

[1] It is the policy of this court to refer to victims of sex crimes by their initials. We will refer to the victim by her initials due to the nature of the allegations at issue in this case.

throat [and was] trying to push [her] in the house." According to the victim, the Defendant pushed her so hard it bent her door key as she attempted to unlock the door.

The victim testified that once they were inside the trailer, the Defendant "threw [her] towards [the] kitchen," then grabbed her by her hair, and pulled her to the bedroom. Inside the bedroom, the Defendant told the victim to undress and threatened to rip her clothes off when she hesitated. The victim testified that she took off her shirt while the Defendant undressed and that the Defendant then removed her pants and underwear.

According to the victim, the Defendant grabbed her by her hair and threw her "on the bed face down and started . . . to rape [her]." The victim explained that the Defendant held her down "by the back of [her] neck" and penetrated her vagina with his penis. According to the victim, the Defendant asked her if "this [was] how [Mr. Sering] [did] this" while the Defendant penetrated her. The victim testified that this lasted for approximately fifteen minutes until the Defendant ejaculated.

The victim testified that the Defendant raped her five or six times during the course of the day. The victim further testified that she repeatedly tried to leave the trailer, but that the Defendant prevented her from doing so by taking her keys, hiding her pants, and physically restraining her. According to the victim, the Defendant choked her until she blacked out during all of the rapes except for the first one. The victim denied that she asked the Defendant to choke her.

The victim described the last rape in detail, testifying that the Defendant was on top of her and "was pushing down [on her throat] to where [she] was seeing stars and blacking out" and that he "proceeded to rape [her] again." The victim testified that the Defendant left her trailer around 2:30 p.m. The Defendant told her that he had to get home before his wife found out that he had missed work that day. According to the victim, her head was bleeding when the Defendant left from his having pulled her hair so hard that morning.

The victim testified that she did not leave her trailer until 10:30 p.m. when her father came to check on her. The victim went with her father to spend the night at his house. The victim explained that she did not contact the police because she was scared of the Defendant and that she did not tell her father because it was "just not something [she] wanted to tell [her] father at all."

The victim testified that the Defendant contacted her the next day wanting to "hang." The Defendant told her that he wanted to take her to dinner at Applebee's to make up for the previous day. The victim testified that she eventually agreed to see the Defendant because she "was actually scared of him for sure after" what he had done the day before.

-3-

According to the victim, she and the Defendant went back to her trailer after dinner and stayed up until 4:00 or 5:00 a.m. drinking alcohol and talking. At some point during the night, the victim's brother and her brother's family briefly stopped by the trailer while the Defendant was there. The victim testified that the Defendant wanted to have sex with her that night but she told him no. The victim estimated that the Defendant left her trailer around 5:00 or 6:00 a.m. The victim then went to Mr. Sering's apartment.

The victim testified that she was "[s]leepy and crying" when she got to Mr. Sering's apartment and that she "broke down and told him what happened." According to the victim, she was explaining to Mr. Sering why she was ending her relationships with him and the Defendant when she told him about what the Defendant had done. The victim testified that Mr. Sering told her that it "was rape" and "that [she] needed to report it." The victim and Mr. Sering then went to the victim's father's house. The victim testified that she "had [Mr. Sering] tell [her] dad" and that her father then called the police.

The victim admitted that she was currently in a relationship with Mr. Sering. However, the victim denied that she had falsely accused the Defendant of rape so she could be with Mr. Sering. The victim also denied that she wanted the Defendant to leave his family for her. The victim further denied that the Defendant beat her with a belt on the morning of January 15, 2016. However, the victim did tell one of the investigating officers that the Defendant had beat her with a belt causing her buttocks to bleed.

Mr. Sering testified that he received a text message from the victim at approximately 6:00 a.m. on January 17, 2016, "asking if she could get the rest of her stuff." Mr. Sering recalled that the victim "was very upset" when she arrived at his apartment. According to Mr. Sering, the victim "was physically shaking" and she "immediately walked in and sat down at [his] kitchen table." The victim "put her head down and started crying."

Mr. Sering testified that he told the victim that he still wanted to be friends even though their romantic relationship was over, but that he thought he Defendant "might be a problem." According to Mr. Sering, the victim responded that "it's gonna be a problem" and "then she went ahead and explained what had happened" on January 15, 2016.

Mr. Sering testified that the victim "showed [him] the spot on her head where her hair was missing where [the Defendant had] yanked it out." Mr. Sering further testified that the victim asked him what she should do and that he told her she needed to call the police. According to Mr. Sering, he also asked the victim if she was "sure this [was] what happened because these [were] really strong allegations," and she responded,

-4-

"[y]es." Mr. Sering testified that they then went to the victim's father's house and that he told the victim's father what she had told him. The victim's father then called the police.

The Defendant's wife testified that he had never been violent toward her or anyone else. She also testified that she and the Defendant had never engaged in bondage or "beatings" during sex. She admitted that she was unaware that the Defendant and the victim were having an affair until the Defendant was arrested on these charges.

The Defendant testified that he had a lengthy sexual relationship with the victim. The Defendant claimed that the victim had introduced him to "unusual, kinky sex" and that he had "never seen anything like it before." The Defendant further claimed that the victim had asked him in the past to choke her and pull her hair. The Defendant testified that the victim routinely asked him to spank her with his hand, but that he had stopped because it "hurt [his] hands and [he] didn't want to do [it] anymore." The Defendant claimed that the victim then began asking him to beat her with his belt, but he denied ever causing the victim to bleed. The Defendant also claimed that he and the victim "practice[d] bondage" and that the victim "had to talk [him] into it because [he] was quite frightened of it."

The Defendant testified that he was not bothered by the picture of the victim that Mr. Sering had posted on Facebook. The Defendant explained that his relationship with the victim "was sex" and "not love." The Defendant claimed that his altercation with Mr. Sering on January 14, 2016, was not about the victim. Rather, the Defendant testified that it was "really nothing" and that they had "just gibber-jabbered." The Defendant claimed that he went to the victim's trailer after his altercation with Mr. Sering and that he and the victim had sex that afternoon. The Defendant also claimed that later that night the victim drove by his house.

The Defendant claimed that he and the victim had decided the night before to both call-in to work on January 15, 2016. The Defendant explained that the victim wanted him to come to her trailer to have sex and to "try to figure out how [they] were going to save [their] jobs and fix that situation . . . [because they] had this weird triangle going on." Despite having testified that they had decided the night before to call-in to work, the Defendant claimed that the victim was dressed in her work uniform, that she was driving to work, and that he had to call her again that morning to remind her that they had decided to go to the trailer to talk things over.

The Defendant testified that he thought he was invited inside the victim's trailer and denied forcing the victim inside. The Defendant also denied that he took off the victim's pants and underwear, that he dragged the victim around by her hair, or that he kept the victim confined in her trailer. The Defendant claimed that he and the victim talked for about an hour before they had sex. The Defendant testified that the sex was

-5-

consensual and that they had sex several times that day. The Defendant also claimed that the victim asked him to beat her with his belt and to choke her.

The Defendant testified that the victim wanted to see him the next day and claimed that they had sex that night. The Defendant denied ever hurting or threatening the victim and testified that the victim was not afraid of him. The Defendant claimed that the victim wanted him to leave his wife and that he lied to the victim about their relationship so that the victim would continue to have sex with him.

At the close of proof, the State dismissed five of the rape counts. The State then elected the first instance of penetration and the last instance of penetration the victim had described in her testimony for the remaining rape charges. Before announcing its verdict, the trial court stated that the jury instruction on witness credibility played an important role in its deliberations. The trial court then acquitted the Defendant of aggravated kidnapping and convicted the Defendant of aggravated assault and the lesser-included offenses of aggravated criminal trespass of a habitation for the aggravated burglary charge and assault for the two remaining rape charges. Following a sentencing hearing, the trial court imposed a total effective sentence of three years to be served on supervised probation. This appeal timely appeal followed.

## ANALYSIS

### I. Sufficiency of the Evidence

The Defendant contends that the evidence was insufficient to sustain his convictions. The State responds that the Defendant has waived full appellate review of this issue due to deficiencies in his brief.

The Defendant's brief is alarmingly inadequate with respect to this issue. The Defendant fails to make any argument beyond a few brief statements at the conclusion of his brief and fails to cite to any legal authorities, not even the statutes defining the offenses for which he was convicted, to support his contention that the evidence was insufficient to sustain his convictions. As such, the Defendant has waived full appellate review and we will review this issue solely for plain error. See Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument[ or] citation to authorities . . . will be treated as waived in this court").

The doctrine of plain error applies when all five of the following factors have been established:

(a) the record must clearly establish what occurred in the trial court;
(b) a clear and unequivocal rule of law must have been breached;

(c) a substantial right of the accused must have been adversely affected;

(d) the accused must not have waived the issue for tactical reasons; and

(e) consideration of the error must be "necessary to do substantial justice."

State v. Page, 184 S.W.3d 223, 230-31 (Tenn. 2006) (quoting State v. Terry, 118 S.W.3d 355, 360 (Tenn. 2003)) (internal brackets omitted). "An error would have to [be] especially egregious in nature, striking at the very heart of the fairness of the judicial proceeding, to rise to the level of plain error." Id. at 231.

Here, the Defendant has failed to show that a clear and unequivocal rule of law has been breached. Page, 184 S.W.3d at 230. The Defendant's argument on this issue is limited to attacking the victim's credibility, deeming her "a lying nymphomaniac." However, questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence are to be resolved by the trier of fact. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). We will not disturb the trial court's credibility determinations on appeal. Accordingly, we conclude that the Defendant has failed to demonstrate plain error.

## II. Fresh Complaint Evidence

The Defendant contends that the trial court erred in allowing Mr. Sering to testify about what the victim told him on the morning of January 17, 2016. The Defendant argues that Mr. Sering's testimony did not qualify under the fresh complaint doctrine because the victim's statements were made several days after the alleged rapes. The State responds that the trial court did not err in admitting Mr. Sering's testimony.

The doctrine of fresh complaint "has ancient origins" and was designed to counter the sexist common-law requirement that female rape victims raise a "hue and cry." State v. Kendricks, 891 S.W.2d 597, 600-02 (Tenn. 1994). As such, fresh complaint evidence "is highly unusual in the sense that such evidence is neither purely substantive nor purely rehabilitative." Id. at 600. While our supreme court has noted that it "would certainly prefer to abolish the doctrine in its entirety, given its genesis in the profoundly sexist expectation that female victims of sexual crimes should respond in a prescribed manner or risk losing credibility," abolishing the doctrine of fresh complaint would deny victims "one of the few methods to rebut the expectation of outcry, [still] deeply rooted in our culture." Id. at 604.

To that end, the fresh complaint doctrine in Tennessee allows certain evidence to be used to corroborate an adult victim's allegations of rape or other sexual offenses. Testimony about "the fact of the complaint" but not "the details of the incident" is admissible in the State's case-in-chief even if the victim's credibility has not been

attacked. Kendricks, 891 S.W.2d at 603. However, once the victim's credibility has been attacked, details of the complaint become admissible as rehabilitative evidence. Id.

Here, Mr. Sering testified that the victim "explained what had happened" on January 15, 2016, that she "showed [him] the spot on her head where her hair was missing where [the Defendant had] yanked it out," and that she asked him what he thought she should do. Mr. Sering testified that he advised the victim to call the police if she was "sure this [was] what happened because these [were] really strong allegations" and that they then went to the victim's father's house and the police were notified.

Mr. Sering's testimony that the victim "explained what had happened" and that he advised her to call the police if she was "sure this [was] what happened" was testimony about the fact of the complaint. Mr. Sering's testimony that the victim "showed [him] the spot on her head where her hair was missing where [the Defendant had] yanked it out" was testimony about the details of the incident. However, the Defendant had vigorously attacked the victim's credibility prior to Mr. Sering's testimony. As such, we conclude that Mr. Sering's testimony qualified as fresh complaint evidence.

The Defendant's argument on appeal focuses on the timeliness of the victim's complaint to Mr. Sering. The Defendant argues that it does not qualify as fresh complaint evidence because almost two days had passed between the alleged rapes and the victim's telling Mr. Sering about the incident.

However, "the 'timeliness' requirement of the 'fresh complaint' doctrine is not nearly as stringent as it is in the realm of the excited utterance exception to the hearsay rule." Kendricks, 891 S.W.2d at 605. "The timeliness of the complaint is still an important requirement for admissibility, but whether a complaint was timely depends upon an assessment of the facts and circumstances." Id. This court has previously held that a statement made "some three or four days after the events in issue" was timely for purposes of the fresh complaint doctrine. See State v. Schaller, 975 S.W.2d 313, 321 (Tenn. Crim. App. 1997).

Here, Mr. Sering was the first person the victim told about the alleged rapes. The victim testified that she did not initially call the police because she was afraid of the Defendant and that she was embarrassed to tell her father. The victim testified that she agreed to see the Defendant the day after the alleged rapes because she "was actually scared of him for sure after" what he had done the day before. The Defendant was with the victim when she saw her brother that night. Furthermore, the Defendant had raised the fact that the victim did not immediately report the alleged rapes to attack the victim's credibility. This is the exact type of argument that fresh compliant evidence is meant to rehabilitate. Accordingly, we conclude that the victim's statements to Mr. Sering were timely for purposes of the fresh complaint doctrine.

Furthermore, any error in admitting Mr. Sering's testimony would be harmless in light of the fact that the victim testified, without objection from defense counsel, that she "broke down and told [Mr. Sering] what happened." See Tenn. R. App. P. 36(a) (providing that "[n]othing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error"). Accordingly, we conclude that the trial court did not err in admitting Mr. Sering's testimony.

## CONCLUSION

Upon consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

_____
D. KELLY THOMAS, JR., JUDGE